------------------------
## CASE NO. 13-30790
------------------------

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

----------------------------------------------------------------------

**ATEL MARITIME INVESTORS, L.P.; ATEL MARITIME INVESTORS, III, L.P.; KALAKANE, L.L.C., formerly known as Kala Kane, L.L.C.,**

### Plaintiffs - Appellants

**v.**

**SEA MAR MANAGEMENT, L.L.C.; NABORS WELL SERVICES COMPANY; NABORS INDUSTRIES, LIMITED,**

### Defendants – Appellees

-----------------------------------------------------------------
### On Appeal from the United States District Court
### for the Eastern District of Louisiana
-----------------------------------------------------------------

ORIGINAL BRIEF ON BEHALF OF APPELLANTS, ATEL MARITIME INVESTORS, L.P.; ATEL MARITIME INVESTORS, III, L.P.; KALAKANE, L.L.C., formerly known as Kala Kane, L.L.C.,

_____

GLENN G. GOODIER, T.A. (#06130) – Lead Counsel
CHRISTOPHER S. MANN (#26397)
MATTHEW S. LEJEUNE (#32552)
Jones Walker LLP
201 St. Charles Avenue, 48th Floor
New Orleans, Louisiana 70170-5100
Telephone:     (504) 582-8332
Facsimile:     (504) 589-8332
E-mail:     ggoodier@joneswalker.com
E-mail:     cmann@joneswalker.com
E-mail:     mlejeune@joneswalker.com
*Attorneys for Appellants, ATEL Maritime
Investors, LP, ATEL Maritime Investors, III,
LP, and Kalakane, LLC, formerly known as
Kala Kane, LLC*

------------------------
### CASE NO. 13-30790
------------------------

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

--------------------------------------------------------------------

**ATEL MARITIME INVESTORS, L.P.; ATEL MARITIME INVESTORS, III, L.P.; KALAKANE, L.L.C., formerly known as Kala Kane, L.L.C.**

**Plaintiffs - Appellants**

**v.**

**SEA MAR MANAGEMENT, L.L.C.; NABORS WELL SERVICES COMPANY; NABORS INDUSTRIES, LIMITED,**

**Defendants – Appellees**
-----------------------------------------------------------------
### On Appeal from the United States District Court
### for the Eastern District of Louisiana
-----------------------------------------------------------------

## CERTIFICATE OF INTERESTED PERSONS
## REQUIRED BY LOCAL RULE 28.2.1

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1.     ATEL Maritime Investors, L.P.;

2.     ATEL Maritime Investors, III, L.P.;

3.      Kalakane, L.L.C., formerly known as Kala Kane, L.L.C.;

4.      ATEL Capital Group

5.      Glenn G. Goodier, Christopher S. Mann, Matthew S. Lejeune of Jones Walker LLP, 201 St. Charles Avenue, New Orleans, LA 70170, Counsel for Appellants, ATEL Maritime Investors, LP, ATEL Maritime Investors, III, LP, and Kalakane, LLC, formerly known as Kala Kane, L.L.C.;

6.      Sea Mar Management, L.L.C.;

7.      Nabors Well Services Company;

8.      Nabors Industries, Limited;

9.      Thomas J. Smith, Amanda Elizabeth Kurz of Galloway, Johnson, Tompkins, Burr & Smith, One Shell Square – 40th Floor, 701 Poydras Street, New Orleans, LA 70130, Counsel for Appellees, Sea Mar Management, L.L.C., Nabors Well Services Company, and Nabors Industries, Limited.

This 14th day of November, 2013.

*/s/ Glenn G. Goodier*

GLENN G. GOODIER (#06130) – Lead Counsel
CHRISTOPHER S. MANN (#26397)
MATTHEW S. LEJEUNE (#32552)
Jones Walker LLP
201 St. Charles Avenue, 48th Floor
New Orleans, Louisiana 70170-5100
Telephone:      (504) 582-8332
Facsimile:      (504) 589-8332
E-mail:        ggoodier@joneswalker.com
E-mail:   cmann@joneswalker.com
E-mail:        mlejeune@joneswalker.com

*Attorneys for Appellants, ATEL Maritime*
*Investors, LP, ATEL Maritime Investors, III,*
*LP, and Kalakane, LLC*

## STATEMENT REGARDING ORAL ARGUMENT
## PURSUANT TO LOCAL RULE 28.2.4

Oral argument is requested because of the complexity of the issues presented

for review.

# TABLE OF CONTENTS

Certificate of Interested Persons Required by Local Rule 28.2.1 ............................ i

Statement Regarding Oral Argument Pursuant to Local Rule 28.2.4 ..................... iv

Table of Contents ............................................................................................. v

Table of Authorities ........................................................................................ vii

Jurisdictional Statement ................................................................................... 1

Statement of Issues Presented .......................................................................... 1

Statement of the Case ...................................................................................... 3

Statement of Facts .......................................................................................... 5

Summary of the Argument .............................................................................. 20

Standard of Review ........................................................................................ 25

Argument ....................................................................................................... 26

Point I  SMM and NWS committed fraud, intentional misrepresentation, and/or negligent misrepresentation in actively concealing the existence and extent of the "marketing arrangement" between NWS and SMM ............................................. 26

Point II  The District Court misinterpreted the MBCA ......................................... 32

Point II(A)  The type of subchartering agreement entered into between NWS and SMM was not allowed under the terms of the MBCA ........................................... 34

Point II(B)  NWS' marketing of the ATEL vessels was not an "other service" permitted under article 13 of the MBCA ............................................................. 40

Point II(C)  SMM's blanket chartering of the ATEL vessels to NWS did not satisfy its time chartering/marketing obligations under the MBCA .................................. 43

Point II(D)  SMM did not use "commercially reasonable efforts" to market the ATEL vessels ................................................................................................. 48

Point III  ATEL suffered damages as a result of SMM's breaches of the MBCA . 51

Point IV  NWS and SMM were engaged in a single business enterprise ............... 54

Point V  NWS' retention of the additional 10% of revenue earned by the ATEL vessels that was concealed from ATEL constitutes conversion ............................ 62

Conclusion ...................................................................................................... 63

Certificate of Service .......................................................................................... 65

Certificate of Compliance with Rule 32(a) .......................................................... 66

# TABLE OF AUTHORITIES

## CASES

*Abbott v. Equity Group, Inc.,* 2 F.3d 613, 626 (5th Cir.1993) ................................. 33

*American Totalisator Co., Inc. v. Fair Grounds Corp.,*
   3 F.3d 810, 813 (5th Cir.1993) ......................................................... 33

*Blachy v. United States,*
   380 F.2d 665, 673-74 (5th Cir. 1967) ................................................... 27

*Black Gold Marine, Inc. v. Jackson Marine Co., Inc.,*
   759 F.2d 466, 470 (5th Cir. 1985) ...................................................... 27

*Bourg v. Chevron U.S.A. Inc.,*
   91 F.3d 141 (5th Cir. 1996) ........................................................... 33

*Carter v. BRMAP,* 591 So.2d 1184, 1188 (La.Ct.App.1991) ................................. 33

*Coastal (Bermuda) Ltd. v. E.W. Saybolt & Co., Inc.,*
   826 F.2d 424, 428-429 (5th Cir.1987), reh'g denied .......................................... 31

*Exxon Corp. v. Cent. Gulf Lines, Inc.,* 500 U.S. 603, 605-06 (1991) ...................... 52

*Grass v. Credito Mexicano, S.A.,*
   797 F.2d 220 (5th Cir.1986), cert. denied, 480 U.S. 934,
   107 S.Ct. 1575, 94 L.Ed.2d 766 (1987) ................................................. 31

*Green v. Champion Ins. Co.,*
   577 So.2d 249, 257 (La. App. 1 Cir. 1991) ..................................... 54, 55, 56, 57

*Hale Container Line, Inc. v. Houston Sea Packing Co., Inc.,*
   137 F.3d 1455, 1471 ................................................................. 31

*In re Athena Construction, L.L.C.,* 2008 WL 3186743 (W.D. La. 2008) ............... 54

*In re Taira Lynn Marine Ltd. No. 5, LLC,* 444 F.3d 371, 376 (5th Cir. 2006) ....... 25

*Krauss Bros. Lumber Co. v. Dimon S.S. Corp.,* 290 U.S. 117, 124 (1933) ............ 52

*Marine Transp. Lines, Inc. v. M/V Tako Invader*,
   37 F.3d 1138, 1142 (5th Cir. 1994) ................................................. 26

*Morris v. Homco Int'l, Inc.,* 853 F.2d 337, 346 (5th Cir. 1988) ............................ 52

*Nitram, Inc. V. MV Cretan Life,* 599 F.2d 1359, 1368-69 (5th Cir. 1979) ............. 33

*Occidental of Umm al Qaywayn, Inc. v.*
   *A Certain Cargo of Petroleum Aboard the Tanker Dauntless Colocotronis,*
   577 F.2d 1196, 1202 (5th Cir. 1978) ................................................. 63

*Oracle 1031 Exchange, LLC v. Bourque*,
   2012 WL 385115 (La. App. 3 Cir. 2/8/12) ........................................ 56

*Patterson v. City of New Orleans,* 686 So.2d 87, 90 (La.Ct.App.1996) ............... 33

*Polar Steamship Corporation v. Inland Overseas Steamship Corporation,*
   136 F.2d 835,  841 (4th Cir. 1943) ...................................................... 52

*Quealy v. Paine, Webber, Jackson & Curtis, Inc.,*
   475 So.2d 756, 760 (La. 1985) ........................................................... 63

*Ramirez v. Dretke,* 396 F.3d 646, 649 (5th Cir. 2005) ........................................... 26

*Rashidi v. American President Lines, Ltd.,*
   1994 WL 321031 (E.D. La. 1994) (citing La. C.C. arts. 1953, 2315)................ 27

*Stolt Achievement, Ltd. v. Dredge B.E. Lindholm,*
   447 F.3d 360, 363  (5th Cir. 2006) ............................................... 25, 26

*Strong v. B.P. Exploration & Prod., Inc.,*
   440 F.3d 665, 668 (5th Cir. 2006) ...................................................... 25

*The Ely,* 110 Fed. 563, 570 (S.D. N.Y. 1901, affirmed 122 F. 447 (2d Cir. 1903),
   cert denied 189 U.S. 514 (1903)). ...................................................... 35

*Thrift v. Hubbard,* 44 F.3d 348, 357 (5th Cir.1995)............................................. 33

*Tokio Marine & Fire Ins. Co., Ltd. v. FLORA MV*,
   235 F.3d 963, 966 (5th Cir. 2001) ...................................................... 26

*Weathersby v. Conoco Oil Co.,* 752 F.2d 953, 955 (5th Cir. 1984) ........................ 33

*Wilson v. Job, Inc.,* 958 F.2d 653, 657 (5th Cir. 1992) .................................... 33, 37

## STATUTES

28 U.S.C. § 1291 ................................................................................ 1
28 U.S.C. § 1332 ................................................................................ 1
28 U.S.C. § 1333 ................................................................................ 1
BENEDICT'S ON ADMIRALTY § 185 (7th Ed. 2008) .................................. 35

## OTHER AUTHORITIES

Restatement (Second) of Torts § 552 (1977)........................................... 31

## JURISDICTIONAL STATEMENT

The District Court had admiralty and maritime jurisdiction over the action by ATEL Maritime Investors, LP, ATEL Maritime Investors, III, LP, and Kalakane, LLC, formerly known as Kala Kane, L.L.C. (collectively "ATEL"), against Sea Mar Management, L.L.C. ( "SMM"), Nabors Well Services Company ( "NWS"), and Nabors Industries, Limited ( "NIL"), pursuant to 28 U.S.C. § 1333 as it involves a maritime contract, and diversity jurisdiction pursuant to 28 U.S.C. § 1332, as ATEL and Appellees are citizens of different states and the amount in controversy exceeds $75,000. The District Court entered a final judgment dismissing ATEL's claims on June 24, 2013.[1] ATEL filed a timely notice of appeal on July 23, 2013.[2] There is jurisdiction for this appeal from the District Court's final judgment under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES PRESENTED

Issue 1: Did the District Court err in holding that the actions of SMM and NWS in concealing the "marketing" scheme from ATEL did not constitute fraud and/or intentional misrepresentation and/or negligent misrepresentation?

---

[1] ROA 11096.
[2] ROA 11097-11098.

Issue 2:  Did the District Court err in interpreting the various provisions of the Master Bareboat Charter Agreements ("MBCA") between ATEL and SMM?

> Issue 2(A):  Did the District Court err in holding that the subchartering agreement between NWS and SMM was allowed under the terms of the MBCA?

> Issue 2(B):  Did the District Court err in holding that NWS' marketing of the ATEL Vessels was allowed as an "other service" under Article 13 of the MBCA?

> Issue 2(C):  Did the District Court err in holding that SMM discharged its marketing obligations under the MBCA by simply chartering the ATEL Vessels to NWS?

> Issue 2(D):  Did the District Court err in holding that SMM used "commercially reasonable efforts" to market the ATEL Vessels?

Issue 3:  Did the District Court err in holding that ATEL suffered no damages as a result of SMM's breach of the MBCA?

Issue 4:  Did the District Court err in holding that NWS and SMM were not engaged in a "single business enterprise"?

Issue 5:  Did the District Court err in holding that the retention of the 10% mark-up by NWS did not constitute conversion?

ATEL answers all of the questions in the affirmative and requests that the District Court's final judgment be reversed, with directions to enter judgment in favor of ATEL in the amount of $2,873,508.00, plus pre- and post-judgment interest.

## STATEMENT OF THE CASE

On July 7, 2004, SMM and ATEL entered into the MBCA[3] for the chartering and management of four vessels owned by ATEL, the M/V CAPE KUMUKAHI, M/V CAPE ATLAS, M/V CAPE HANAMANOIA, and M/V CAPE KALA KANE, (the "Vessels").[4] The MBCA required SMM to both market and manage the day-to-day operations of the Vessels. In breach of the MBCA, SMM transferred all of its marketing obligations to NWS through a Master Time Charter Agreement ("MTCA") which was executed by SMM and NWS on January 19, 2005.[5] Through this "marketing arrangement" which was never disclosed to and actively concealed from ATEL, NWS skimmed 10% of all charter hire earned by the Vessels by first obtaining a charter for the Vessels at market rate, then reporting only 90% of

---

[3] As the District Court noted, although two charter agreements were entered into covering the four Vessels, the terms of the charter agreements are identical with the exception of the vessel names and ATEL entities involved. As such, ATEL will treat the MBCA as one agreement for purposes of this appeal.

[4] Exhibits P-1 and P-2, MBCA.

[5] Exhibit P-3, MTCA.

this rate to SMM, who in turn contemporaneously reported this 90% to ATEL, as the revenues being generated by the Vessels.

As a result of these breaches of the MBCA and the fraudulent and tortious conduct of SMM and NWS, ATEL sued SMM, NWS and NIL asserting claims for, *inter alia,* breach of contract, fraud, attorney's fees, conversion, unjust enrichment, single business enterprise, intentional misrepresentation, negligent misrepresentation and intentional interference with contract.[6]

SMM filed a motion for summary judgment on November 9, 2009 seeking dismissal of ATEL's claims for breach of contract and fraud on the grounds that SMM met all obligations under the MBCA and made no misrepresentations because it was unaware of the higher rates being charged by NWS.[7]   The District Court denied SMM's motion on December 21, 2009.[8]

Following a bench trial, the District Court entered a Judgment[9] and an Opinion[10] on June 24, 2013 dismissing ATEL's claims against the defendants.  ATEL timely filed a notice of appeal on July 23, 2013.[11]

---

[6] ROA 71-81, 698-702, 3593-3821, 4123-4135.
[7] ROA 1702-1855.
[8] ROA 3530-3537.
[9] ROA 11096.
[10] ROA 11060-11095.
[11] ROA 11097-11098.

# STATEMENT OF FACTS

SMM and NWS have a common origin. Sea Mar Management, Inc. was originally owned by Al Gonsoulin.[12] Under Gonsoulin's ownership, Sea Mar Management, Inc. owned and operated 20-30 of its own vessels which were chartered to oil and drilling companies ("End-Users") through master service agreements ("MSA's").[13] Darrel Plaisance ("Plaisance"),[14] Van DeWitt ("DeWitt"),[15] and John Powell ("Powell")[16] served as officers of Sea Mar Management, Inc. In early 2000, Gonsoulin sold Sea Mar Management, Inc., including all of its vessels and continuing operations to Pool Well Services, Inc. ("Pool").[17] Shortly thereafter, Nabors Industries, Inc. ("NII") purchased Pool, including its wholly owned subsidiary Sea Mar Management, Inc., and later changed Pool's name to Nabors Well Services ("NWS").[18] Throughout the course of these transactions, Sea Mar Management, Inc. was operated as a separate, but wholly owned subsidiary

---

[12] Plaisance, T.Tr., ROA 11520; DeWitt, T.Tr., ROA 11773-11774.

[13] Plaisance, T.Tr., ROA 11521; DeWitt, T.Tr., ROA 11776.

[14] Plaisance, T.Tr., ROA 11521.

[15] Dewitt, T.Tr; ROA 11773-11774, 11779.

[16] Dewitt, T.Tr., ROA 11775-11776.

[17] Plaisance, T.Tr., ROA 11524; DeWitt, T.Tr., ROA 11774, 11776.

[18] Plaisance, T.Tr., ROA 11524; DeWitt, T.Tr., ROA 11774; Doerre, T.Tr., ROA 11993-11994.

corporation providing the same vessel services and continued to employ DeWitt, Plaisance, and Powell in the same capacities.[19]

Nabors Industries Ltd. ("NIL"), the ultimate parent corporation, was formed and relocated to Bermuda in 2002 as part of a process referred to by Defendants as an "inversion."[20]   This inversion prevented NIL, now a foreign entity, from operating its U.S. flagged vessels in coastwise trade under U.S. law.[21]   In order to circumvent the restriction in coastwise trade, Sea Mar Management, Inc. was split into *four* entities: Sea Mar Division of Pool Well Services (predecessor to NWS), Sea Mar Investco, LLC ("Investco"), SMM and Nabors U.S. Finance, LLC ("Nabors Finance"). These four entities continued to collectively perform the exact same functions that Sea Mar Management, Inc. performed alone prior to the inversion.

As a result of the "inversion," ownership of the Nabors vessels was transferred through a lease finance to Nabors Finance, which was owned by NIL, whose sole role was to own the vessels and bareboat charter them only to SMM.[22]   Nabors Finance was a U.S. company but was ultimately owned

---

[19] Plaisance, T.Tr., ROA 11524; Dewitt, T.Tr., ROA 11773-11774, 11778-11779; Doerre, T.Tr. ROA 11995.
[20] Plaisance, T.Tr., ROA 11525, 11638-11639.
[21] Plaisance, T.Tr., ROA 11526.
[22] Plaisance, T.Tr., ROA 11528; Dewitt, T.Tr., ROA 11785, Doerre, T.Tr., ROA 11996.

by NIL. A loophole in U.S. Law allowed foreign investors, such as Nabors Finance to purchase U.S. flag vessels, but it would not allow them to operate the vessels in coastwise trade.

Consequently, at the time of the inversion, all Nabors' vessels were immediately bareboat chartered by Nabors Finance to SMM and then immediately time chartered to NWS for a five year term.[23] NWS was the only entity with which SMM entered into time charters.[24] As such, SMM received no business other than that of its affiliate corporation, NWS.

ATEL purchased the Vessels from Seacor in the late 1990s and then bareboat chartered the vessels back to Seacor who paid ATEL a flat fee.[25] When the Vessels came off charter with Seacor, Plaisance contacted Tom Monroe ("Monroe"), Senior Vice President at ATEL, in October 2003 and suggested that SMM manage the Vessels and market them to End-Users.[26]

Plaisance represented to ATEL that SMM managed and marketed a fleet of vessels owned by Nabors and that SMM could do likewise for ATEL.[27] Monroe and Plaisance first discussed entering into a vessel

---

[23] Dewitt, T.Tr., ROA 11796.
[24] Dewitt, T.Tr., ROA 11826; Powell, T.Tr., ROA 12314.
[25] Monroe, T.Tr., ROA 11699-11700.
[26] Monroe, T.Tr., ROA 11703-11705.
[27] Monroe, T.Tr., ROA 11705.

management agreement.[28]   Plaisance informed Monroe he had a good relationship with a network of End-Users.[29]   SMM never informed ATEL that SMM would not market the Vessels and that NWS, not SMM, would actually market the Vessels[30].

Prior to entering into the MBCA, ATEL performed due diligence on SMM.   Monroe consulted with an expert surveyor, Phil Latham, who represented that SMM was a well-respected company.[31]   ATEL's Chief Credit Officer also visited SMM on two occasions and met with the SMM staff prior to the MBCA's execution.[32]

During the contract negotiations, DeWitt instructed Plaisance that "Nabors wanted their attorney to handle negotiations . . ." and  DeWitt  and Jim Lank, a Nabors in-house attorney, negotiated the MBCA with Plaisance acting as a go-between.[33]   ATEL was never made aware that anyone with NWS had any role in negotiating the terms of the MBCA.[34]

The Investco board, which included DeWitt, perfunctorily approved SMM's entering into the MBCA between ATEL and SMM, which had been

---

[28] Monroe, T.Tr., ROA 11707, 11769-11770.
[29] Monroe, T.Tr., ROA 11715.
[30] Plaisance, T.Tr., ROA 11547-11548, 11642; Monroe, T.Tr., ROA 11708.
[31] Monroe, T.Tr., ROA 11706.
[32] Monroe, T.Tr., ROA 11701, 11706, 11747-11748.
[33] Plaisance, T.Tr., ROA 11553, 11555-11556; Dewitt, T.Tr., ROA 11838-11839.
[34] Morais, T.Tr., ROA 12122-12123.

changed in name only just prior to execution at the request of SMM from a management agreement to a bareboat charter agreement while retaining all of the management agreement provisions.[35]   The MBCA was finally executed July 7, 2004.[36]

Under the MBCA, ATEL was responsible for paying all Vessel operating expenses in advance to SMM.[37]   ATEL also paid SMM a management fee of $300.00 per day plus an incentive fee of 5% of any amount earned by the Vessels in excess of $5,000.00 a day.[38]   SMM believed this amount, which was three times as much as SMM was being paid by NWS for operating Nabors' vessels, was fair and reasonable.[39]

Under the MBCA, SMM had no risk and could not lose any money.[40] ATEL was responsible for all operating expenses, SMM was to be paid its management fee regardless of whether the Vessels were on or off charter, and SMM bore no risk of unpaid charter hire.[41]

---

[35] Plaisance, T.Tr., ROA 11546-11547.
[36] ROA 10507.
[37] Plaisance, T.Tr., ROA 11556; Dewitt, T.Tr., ROA 11839.
[38] Plaisance, T.Tr., ROA 11560-11561; Monroe, T.Tr., ROA 11708.
[39] Plaisance, T.Tr., ROA 11562-11563.
[40] Plaisance, T.Tr., ROA 11564.
[41] Exhibits P-1 and P-2, MBCA, p. 17;  Plaisance, T.Tr., ROA 11575; Monroe, T.Tr., ROA 11705, 11709.

SMM always knew that NWS would market the Vessels.[42]  However, through initial discussions with DeWitt, Plaisance understood that NWS was to be compensated for its marketing services through NIL's ultimate 25% ownership interest in Investco/SMM.[43]  Plaisance and DeWitt never discussed any other form of compensation, such as NWS' keeping 10% of the charter hire, for NWS' marketing services during the MBCA negotiations, nor for almost five months after the MBCA were signed as discussed *infra*.[44]  No one at SMM ever told ATEL that SMM could not fulfill its marketing obligations or that NWS was going to market the Vessels or that NWS would be taking an additional fee for marketing the Vessels beyond what was agreed in the MBCA.[45]  Further, at the time that the MBCA was executed, there was no agreement in place between SMM and NWS that would allow NWS to market or subcharter the Vessels.[46]

When the Vessels first went into service under the MBCA, SMM issued invoices directly to End-Users as required by the MBCA.[47]  However, NWS negotiated and set the rates that were being charged to the End-

---

[42] Plaisance, T.Tr., ROA 11565-11566.

[43] Plaisance, T.Tr., ROA 11565-11566.

[44] Plaisance, T.Tr., ROA 11566.

[45] Plaisance, T.Tr., ROA 11641-11642; Monroe, T.Tr., ROA 11708.

[46] Dewitt, T.Tr., ROA 11845-11846.

[47] Plaisance, T.Tr., ROA 11591.

Users.[48]  NWS would enter into a time charter with an End-User at a rate

determined by NWS and agreed to by the End-User (the market rate) and

SMM would then send an invoice to the End-User reflecting this market

rate.[49]  Initially there was no difference between the amount invoiced to the

End-User and the amount that was deposited into the ATEL/SMM lockbox

(the "Lockbox"), as was required under the MBCA. [50]

However, shortly after SMM began chartering the Vessels, NWS and

SMM, without the approval of ATEL and in breach of the MBCA, decided

that NWS would begin invoicing all End-Users.[51]

SMM attached as a Schedule to the MBCA a list of approximately

eighty (80) End-Users with existing MSA's with NWS for the time charter

of vessels with whom SMM could enter charters  with ATEL's prior

approval at rates determined by SMM and disclosed to ATEL.  ATEL

performed a credit review on all End-Users on the Schedule.[52]  However,

Plaisance never called ATEL to approve rates quoted for the chartered

---

[48] Plaisance, T.Tr., ROA 11591.

[49] Plaisance, T.Tr. ROA 11592; DeWitt, T.Tr., ROA 11818.

[50] Plaisance, T.Tr., ROA 11574, 11593, 11597; ROA 10508-10509; Exhibit P-19 to P-22 were stipulated by the parties as an accurate compilation of all of the charters of the ATEL vessels showing the rates paid by the End-Users as well as the rates received by SMM.

[51] Plaisance, T.Tr., ROA 11592-11593.

[52] Exhibits P-1 and P-2, MBCA, pp. 32-33; Plaisance, T.Tr., ROA 11621, 11673-11674; Monroe, T.Tr., ROA 11714, 11769.

Vessels, if the End-User was on the Schedule.[53]    The only time that Plaisance called ATEL to specifically discuss rates was when there was a down market and the rate quoted was less than the Vessels had previously earned.[54]    Plaisance always identified the charterer as the End-User – not NWS – and never informed ATEL that the reported rate was 90% of the rate the Vessel was earning from the End-User.[55]    Plaisance believed this discounted amount that NWS told him the Vessel was earning <u>was</u> the market rate the End-User was paying.[56]    ATEL relied on and trusted Plaisance's expertise in determining if the rates earned by the Vessels were commercially reasonable.[57]

Shortly after NWS began invoicing the End-Users directly, Plaisance suspected that there was an undisclosed amount being retained by NWS because the charter forms between SMM and NWS showed two different rates; a higher rate charged to the End-User by NWS and a lower rate being remitted to SMM by NWS.[58]    When Plaisance questioned NWS about this reporting discrepancy, Plaisance began receiving on-charter forms from

---

[53] Plaisance, T.Tr., ROA 11593-11594, 11621, 11673-11674; Monroe, T.Tr., ROA 11714.
[54] Plaisance, T.Tr., ROA 11675.
[55] Plaisance, T.Tr. ROA 11594; 11621; Monroe, T.Tr., ROA 11714-11715.
[56] Plaisance, T.Tr., ROA 11621.
[57] Monroe, T.Tr., ROA 11714, 11716, 11771.
[58] Plaisance, T.Tr., ROA 11619, 11689.

NWS with the higher rate being charged to the End-User underlined blacked out.[59] When Plaisance asked why the lines were blacked out, he was told by NWS employees that he "wasn't entitled to that information."[60]    Plaisance continued to suspect NWS was retaining this 10% discount, but never relayed these suspicions to ATEL.[61]

Prior to Plaisance's "suspicion" about a markup, it was understood that NWS would be compensated for marketing the ATEL Vessels through the 25% interest NIL had in Investco/SMM.[62]  DeWitt also proposed in a November 30, 2004 email that NWS would enter into a "marketing agreement" with SMM and be paid $50 per day by SMM when the Vessels were on-charter which would allow SMM, not NWS, to maintain privity of contract with End-Users and to directly invoice and collect payment from End-Users.[63]

Shortly after November 30, 2004, DeWitt  received a phone call from the CEO of NIL, Eugene Isenberg, that set into motion the events that ultimately led to this lawsuit.  On that call Isenberg directed DeWitt to remit

---

[59] Plaisance, T.Tr., ROA 11602-11603, 11689, 11691.
[60] Plaisance, T.Tr., ROA 11691.
[61] Plaisance, T.Tr., ROA 11619.
[62]Exhibit P-10, November 30, 2004 Email Chain from DeWitt's Assistant to Lank.
[63] Dewitt, T.Tr., ROA 11842-11843, 11851-11854; Exhibit P-10, November 30, 2004 Email Chain from DeWitt's Assistant to Lank.

to SMM 10% less than the charter hire received from the End-User by NWS.[64]

DeWitt passed along Isenberg's directive to the NWS attorney, Lank.[65]  Lank and DeWitt drafted an amendment to the MBCA for ATEL's execution designed to allow NWS to implement the 10% skim directed by Isenberg (the "Amendment").[66]

DeWitt notified the boards of Investco and SMM of Isenberg's directive regarding the 10% skim and Amendment at a board meeting that occurred in early December 2004 shortly after the Isenberg/DeWitt phone call.[67]  Plaisance brought his suspicions of the 10% skimming scheme to the board at the meeting.[68]  Plaisance objected to the skimming and told the board that the MBCA did not allow a fee to NWS for marketing services.[69] Because NWS provided no additional services in exchange for this 10% "marketing fee" outside the marketing services that had been negotiated at arm's length in the MBCA to be provided by SMM and paid for by ATEL, Plaisance testified that ATEL must be informed of the additional 10%  fee

---

[64] Dewitt, T.Tr., ROA  11842-11843; P-15, June 1, 2004 Email Chain from Lank to James Rossi.
[65] Dewitt, T.Tr., ROA 11874-11875.
[66] Dewitt, T.Tr., ROA 11875, 11901.
[67] Dewitt, T.Tr., ROA 11876, 11889; Exhibit P-8, MBCA Proposed Amendment.
[68] Plaisance, T.Tr., ROA 11603.
[69] Plaisance, T.Tr., ROA 11600-11606, 11619; DeWitt, T.Tr. ROA 11876-11878.

and the MBCA would have to be revised.[70]  Although Plaisance expressed his objections to the skimming scheme, DeWitt told him "that's what was going to happen."[71]

DeWitt testified that the purpose of the Amendment was to allow NWS to implement Isenberg's 10% skimming scheme.[72]  On December 14, 2004, DeWitt sent a "CYA" memorandum to Nabors' in-house legal staff spelling out Isenberg's 10% skimming directives which also acknowledged that SMM did not have the capability of providing sales, marketing, or contract services to any entity other than NWS (the "CYA Memo").[73]

The CYA memo makes it clear that NWS did not believe that it could subcharter the vessels at a higher rate without the Amendment.

DeWitt forwarded the Amendment to Powell and Plaisance who passed it along to Monroe.[74]  Plaisance did not inform ATEL of the 10% skimming scheme despite the fact he knew or suspected that this was the reason behind the Amendment.[75]

---

[70] Plaisance, T.Tr., ROA 11604-11605, 11619.

[71] Plaisance, T.Tr., ROA 11605.

[72] Dewitt, T.Tr., ROA 11882-11884.

[73] Exhibit P-12, December 14, 2004 DeWitt Memo; Dewitt, T.Tr., ROA 11892-11893, 11900, 11904.

[74] Exhibit P-6, December 10, 2004 Memo from SMM Board of Directors; Plaisance, T.Tr. ROA 11614-11615, 11618; Dewitt, T.Tr., ROA 11887-11889.

[75] Plaisance, T.Tr., ROA 11619.

Monroe forwarded the Amendment to Vasco Morais, General Counsel at ATEL.[76]  The terms of the proposed Amendment were questioned and never accepted by ATEL.[77]

ATEL could not agree to the Amendment as drafted.  ATEL had "discomfort that this entity [NWS] who we had really no dealings with would somehow be able to complete the obligations of the company that we had contracted with [SMM]."[78]  While ATEL did not specifically object to the concept of NWS subchartering the Vessels, pursuant to the MBCA the subchartering could only be done provided _all_ the revenue earned by the Vessels was disclosed and ATEL would receive _all_ such revenue.[79]

While Morais acknowledged that the concept of subchartering set forth in the Amendment may have been acceptable, his comments to the Amendment made it clear that any subchartering "has to be consistent with the terms of our charter, and, secondly, that we have to conduct due diligence."[80]

Despite ATEL's rejection of the Amendment and Plaisance's objections, NWS proceeded unilaterally with the 10% skimming scheme.

---

[76] Monroe, T.Tr., ROA 11730.
[77] Monroe, T.Tr., ROA 11736.
[78] Morais, T.Tr., ROA 12131-12132.
[79] Morais, T.Tr., ROA 12181.
[80] Morais, T.Tr., ROA 12187.

Lank counseled DeWitt that before the 10% skimming scheme was implemented, ATEL must "have an understanding of how the marketing function actually worked at [SMM]" and that ATEL "need[s] to understand [NWS] will subcharter out at a higher rate" and that there be transparency in "setting up the arrangement" "to head off the kind of litigation you have now." [81]   NWS did not follow its counsel's advice, and no one informed ATEL that SMM and NWS had implemented the  additional undisclosed 10% fee.

Although DeWitt testified that he understood NWS had "to have something in place to time charter these vessels," NWS had in fact begun skimming 10% of the charter hire weeks before the MTCA was executed by SMM and NWS. [82]

In an attempt to circumvent the MBCA and effect the skimming scheme, NWS entered into a time charter with an End-User at the highest rate that NWS could obtain in the existing market (the market rate).[83]   NWS

---

[81] Exhibit P-42,  Lank's Comments to ATEL's Comments to the Amendment; Lank, T.Tr., ROA 12400-12401, 12438-12439, 12444.

[82] Dewitt, T.Tr., ROA 11917; P-19, Summary of M/V CAPE KUMUKAHI Charter Amounts, Time charters entered into with Devon Energy Corp on January 2 and January 10, 2005 show that NWS was skimming 10% of the charter hire prior to the execution of the MTCA by NWS and SMM on January 19, 2005.

[83] Ramirez, T.Tr., ROA 12484-12488.

would then deduct 10% from the End-User rate and report this lower rate as the rate for which the Vessel was being chartered. [84]

NWS would invoice the End-User at the higher market rate.[85]  SMM would then issue an invoice to NWS reflecting the 10% lower rate.[86]  NWS collected the revenue directly from the End-User.[87]  NWS would then remit the market rate charter hire actually earned by the Vessel less 10% to SMM.[88]  The 10% that was skimmed was retained by NWS.  *NWS actively attempted to conceal Isenberg's 10% skimming scheme by expressly instructing its employees not to discuss the  scheme with ATEL.*[89]

Once the scheme was put into motion, and after the first few invoices that Plaisance questioned,  the only information Plaisance received from NWS was an on-charter form showing a charter hire rate which was 10% lower than what was collected by NWS for the Vessels.[90]  There was no indication that there was a 10% discrepancy.  ATEL had no reason to believe it was not receiving the market rate and 100% of what the Vessels were earning  and the End-Users were paying.  That is precisely what

---

[84] Ramirez, T.Tr., ROA 12484-12488; Dewitt, T.Tr., ROA 11883, 12094-12095.
[85] Ramirez, T.Tr., ROA 12484-12488; Dewitt, T.Tr., ROA 11883, 12094-12095.
[86] Ramirez, T.Tr., ROA 12484-12488; Dewitt, T.Tr., ROA 11883, 12094-12095.
[87] Exhibit P-3, MTCA; Powell, T.Tr. ROA 12321; Ramirez, T.Tr., ROA 12482-12485.
[88] Exhibit P-10, November 30, 2004 Email Chain from DeWitt's Assistant to Lank; Aueyeung, T.Tr., ROA 12285-12288.
[89] Aueyeung, T.Tr., ROA 12278.
[90] Plaisance, T.Tr., ROA 11620-11621.

Plaisance told ATEL.[91]   Furthermore, ATEL was never provided a copy of the charters with the End-Users in violation of the MBCA.[92]

Because this undisclosed 10% fee was retained by a Nabors entity and not by SMM, Nabors received 100% of the skimmed amount as opposed to the 25% that it would have been entitled to through its partial ownership of Investco/SMM, a 400% increase in fee revenue, and providing the economic impetus for the skimming scheme.[93]

NWS, SMM, and Nabors Finance sold all of their assets to Hornbeck on July 20, 2007  because a change in U.S. laws closed the loophole prohibiting U.S. flagged vessels from operating through a lease finance scheme like the one that NIL had in place.[94]

ATEL permitted the assignment of SMM's management duties under the MBCA to Hornbeck and subsequently SMM liquidated all remaining assets and ceased all operations which continues to this day.[95]  Following the assignment, ATEL promptly received a 10% increase in the charter rates.[96] When Monroe questioned Hornbeck regarding the increase, Hornbeck sent the End-User time charters that had been assigned from NWS to ATEL

---

[91] Monroe, T.Tr. ROA 11716, 11739; Plaisance, T.Tr., ROA 11574, 11594, 11621.

[92] Monroe, T.Tr., ROA 11713.

[93] Plaisance, T.Tr., ROA 11615-11616.

[94] Exhibit P-5, July 20, 2007 Asset Purchase Agreement; Plaisance, T.Tr., ROA 11537.

[95] Monroe, T.Tr., ROA 11736-11737

[96] Plaisance, T.Tr.,  ROA 11624-11625.

which showed the 10% higher rates being paid by the End-Users.[97]   This was the first notice to ATEL of the 10% skimming scheme.[98]

## SUMMARY OF THE ARGUMENT

The District Court committed an error of law and clearly erroneous factual findings in finding that the defendants did not commit legal fraud under the clear, undisputed facts of the case.  From the outset of contract negotiations, SMM knew that it did not have the capabilities to market the Vessels.  SMM nonetheless warranted in the MBCA it could and would market the vessels and collected a management fee for its marketing services.  SMM's "warranties" induced ATEL to enter into the MBCA.

After SMM entered into this marketing scheme with NWS in violation of the MBCA, NWS and SMM continued to conceal both the existence of the scheme and the fact that NWS was retaining 10% of all charter hire earned by the Vessels.  Although ATEL rejected a proposed amendment that would have allowed NWS to subcharter the Vessels at a higher rate, NWS nonetheless implemented the scheme.  It is undisputed that NWS never informed ATEL of the 10% that it was retaining despite being advised to do so by its attorney.  NWS further actively concealed its scheme when it

---

[97] Monroe, T.Tr.,  ROA 11738-11740.
[98] Monroe, T.Tr.,  ROA 11738-11740

instructed its employees not to discuss the skimmed amounts with anyone at ATEL and when it sent on-charter forms to SMM with the higher rates being charged to the End-Users blacked out.

The District Court also committed legal error when it incorrectly interpreted the terms of the MBCA in a number of respects. Most importantly, the District Court erroneously found that subchartering of the type carried out by NWS was allowed under the MBCA since the MBCA did not expressly prohibit subchartering. However, the District Court failed to consider whether the further subchartering of the Vessels by NWS complied with the terms of the MBCA – a requirement under both the General Maritime Law and the MBCA. The clear and unambiguous terms of the MBCA prohibited the type of subchartering in which NWS engaged since it required all charters of the Vessels to be in the name of SMM and further required that SMM invoice and collect payment from all charterers of the Vessels and remit the full amount obtained from the charters of the Vessels to ATEL. These provisions, when read as a whole, clearly demonstrate that SMM was the sole party allowed to enter into subcharters for the use of the Vessels and that NWS was therefore prohibited for implementing the skimming scheme.

The effect of the District Court's error was magnified by the fact that it relied upon its finding that this type of subchartering was allowed to dismiss ATEL's tort claims.  In particular, the District Court found that ATEL's conversion claim failed since ATEL could not show that it was entitled to the amounts retained by NWS because subchartering was allowed under the MBCA.  Thus, a finding that the manner in which NWS subchartered the Vessels was permitted by MBCA was legally wrong and clearly erroneous which necessitates a reversal of the District Court's dismissal of ATEL's conversion claim.

The District Court further erred in finding that NWS, as an affiliated company of SMM, was allowed under the MBCA to provide marketing services and to retain an additional 10% fee when SMM was already required to provide these services under the MBCA.  This interpretation by the District Court was legally wrong and would result in ATEL being charged twice for a service SMM was obligated to provide.

This incorrect interpretation of the MBCA also led to the District Court finding that SMM fulfilled its obligations under the MBCA to time charter the Vessels through commercially reasonable efforts.  The MBCA expressly provides that SMM was to solicit, bid, and negotiate all time charters of the Vessels.  At the time the MBCA was signed, SMM knew it

would transfer all of its marketing and time chartering obligations to NWS through the MTCA without the permission of, or even informing, ATEL. SMM made no effort to time charter the Vessels, much less "commercially reasonable efforts." The clearest evidence that SMM was not using "commercially reasonable efforts" to charter the Vessels is that NWS was receiving rates that were 10% higher than those being received by SMM and paid to ATEL. NWS had already locked in the market rate with the End-User before entering into a subcharter with SMM and paying SMM 10% less than the commercially reasonable market rate it had with the End-User.

The District Court's finding that ATEL suffered no damage is also clearly erroneous and legally wrong. ATEL clearly suffered damages as a result of the above breaches which were not recognized by the District Court. The breaches allowed NWS to implement its skimming scheme in which it skimmed $2,873,508.00 from Vessel charters which should have been paid to ATEL under the MBCA. ATEL also suffered damages as a result of those breaches that were found by the District Court, including SMM's failure to collaterally assign security interests in the charters to ATEL, failure to invoice the End-Users, and failure to maintain records of or report to ATEL the amounts retained by NWS. Had SMM performed these obligations, ATEL would have been put on notice of NWS' skimming

scheme and placed SMM in default and/or exercised its right of termination. ATEL could have then contracted with another vessel management company who would have actually complied with the terms of the MBCA and had no problem obtaining the same rates and utilization of NWS due to the "explosion" in the vessel market during the term of the MBCA as a result of Hurricane Katrina.

Throughout their dealings in chartering the Vessels, NWS and SMM acted as a single business enterprise when they used their combined resources to collectively operate, time charter and market the Vessels. Both NWS and SMM were spun off from the same company, Sea Mar Management, Inc., when NIL became a foreign entity. Although they were now separate entities, they continued to perform the exact same functions collectively that were performed by the lone company, Sea Mar Management, Inc. SMM and NWS worked exclusively with one another as SMM did not charter vessels to and NWS did not charter vessels from any other companies. In fact, NWS and SMM represented themselves to the marine industry as one entity, Sea Mar. They were both ultimately owned, at least in part, by NIL and DeWitt was an officer of NWS while also serving on the board of Investco, SMM's parent company who controlled all of SMM's operations. SMM's operations were also 100% financed by funds

received from NWS.  It is clear that NWS' and SMM's business functions were so intertwined that they operated as a single business enterprise and the District Court was legally wrong in not so finding.

Accordingly, the judgment should be reversed and judgment should be entered in favor of ATEL and against both NWS and SMM in the amount of $2,873,508.00, plus interest and attorney's fees as called for in the MBCA.

## STANDARD OF REVIEW

This Court reviews the denial of summary judgment *de novo*, using the same criteria as the district court.[99]

"In an admiralty action following a bench trial, the factual findings are binding unless clearly erroneous."[100]  "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court, based on all of the evidence, is left with the definite and firm conviction that a mistake has been made."[101]  "However, when factual findings in an admiralty case are 'essentially based on an incorrect legal principle, Rule 52(a) clearly

---

[99] *See Strong v. B.P. Exploration & Prod., Inc.*, 440 F.3d 665, 668 (5th Cir. 2006); *see also In re Taira Lynn Marine Ltd. No. 5, LLC*, 444 F.3d 371, 376 (5th Cir. 2006).
[100] *Stolt Achievement, Ltd. v. Dredge B.E. Lindholm*, 447 F.3d 360, 363  (5th Cir. 2006).
[101] *Id.*

erroneous does not apply and [this Court] disregard[s] any such possible findings.'"[102]

The District Court's conclusions of law are reviewed de novo.[103] When examining mixed questions of law and fact, the Court employs "a de novo standard by independently applying the law to the facts found by the district court, as long as the district court's factual determinations are not clearly erroneous."[104]

## ARGUMENT

## POINT I

### SMM AND NWS COMMITTED FRAUD, INTENTIONAL MISREPRESENTATION, AND/OR NEGLIGENT MISREPRESENTATION IN ACTIVELY CONCEALING THE EXISTENCE AND EXTENT OF THE "MARKETING ARRANGEMENT" BETWEEN NWS AND SMM

The District Court erred in finding that NWS did not commit fraud because it relied on the advice of counsel when implementing the 10% skimming scheme despite ATEL's rejection of the Amendment.[105]

To prevail on its fraud claim, ATEL must prove that 1) the deceiving party made a material misrepresentation or non-disclosure; 2) the representation was false or the nondisclosure implied that the facts were

---

[102] *Marine Transp. Lines, Inc. v. M/V Tako Invader*, 37 F.3d 1138, 1142 (5th Cir. 1994).
[103] *Tokio Marine & Fire Ins. Co., Ltd. v. FLORA MV*, 235 F.3d 963, 966 (5th Cir. 2001).
[104] *Ramirez v. Dretke,* 396 F.3d 646, 649 (5th Cir. 2005).
[105] ROA 11089.

different from what the deceived party understood them to be; 3) the deceiving party knew that the representation was false or that the nondisclosure implied the existence of false facts; 4) the deceiving party intended the deceived party to rely on the misrepresentation or nondisclosure; and 5) the deceived party detrimentally relied upon the misrepresentation or nondisclosure. [106]   The elements of a claim for intentional misrepresentation are similar to those for fraud:    (1) misrepresentation of a material fact, (2) with the intent to deceive, and (3) causing justifiable reliance with resultant injury.[107]   "A scheme may be fraudulent even though no affirmative representation of fact be made.  The deceitful concealment of material facts may also constitute actual fraud."[108]

In this case, the record shows that after the MBCA's were executed, Lank, on behalf of NWS, drafted the Amendment which would have expressly allowed NWS to subcharter the Vessels at rates set in its sole discretion.[109]  Despite the fact that Plaisance objected to the Amendment and

---

[106] *Black Gold Marine, Inc. v. Jackson Marine Co., Inc.,* 759 F.2d 466, 470 (5th Cir. 1985).

[107] *Rashidi v. American President Lines, Ltd.,* 1994 WL 321031 (E.D. La. 1994) (citing La. C.C. arts. 1953, 2315).

[108] *Blachy v. United States,* 380 F.2d 665, 673-74 (5th Cir. 1967).

[109] Lank, T.Tr., ROA 12394, 12414-15; Exhibit P-8, MBCA Proposed Amendment; ROA 10589.

ATEL ultimately rejected the Amendment, NWS nonetheless implemented the 10% skimming scheme.[110]

Lank instructed NWS that it must inform ATEL that the new marketing arrangement was in place and that NWS was going to be marking-up the rates.[111]  Lank's instructions were deliberately ignored. Defendants' own expert, Compeaux, also testified that it is industry practice that vessel owners are always informed that a vessel broker or marketing agent is marking up the rates on the chartered vessels in order to retain a fee for its services.[112]

It is clear that NWS actively concealed the existence of the skimming scheme in an attempt to deceive ATEL.  ATEL was never notified that NWS was receiving higher charter rates for the Vessels despite Lank's instructions to the contrary.[113]  After the MTCA was executed and the 10% skimming scheme was firmly in place, NWS actively concealed the existence of the scheme by DeWitt instructing Nabors' employees not to reveal the existence of the scheme to ATEL.[114]  Further, after Plaisance voiced his concerns

---

[110] Plaisance, T.Tr., ROA 11603-05; Dewitt, T.Tr., ROA 11876, 11878.
[111] Lank, T.Tr., ROA 12400-12401, 12438-12439, 12444; Exhibit P-42,  Lank's Comments to ATEL's Comments to the Amendment.
[112] Compeaux, T.Tr., ROA 12244-45, 12264.
[113] Lank, T.Tr., ROA 12399; 12400; Exhibit P-42,  Lank's Comments to ATEL's Comments to the Amendment.
[114] Aueyeung, T.Tr., ROA 12278; ROA 10590.

regarding the fact that NWS on-charter forms showed a higher rate than what was being paid to ATEL, NWS began sending on-charter forms to SMM with the higher rate blacked out.[115]  The District Court inexplicably and clearly erroneously did not consider this compelling uncontroverted testimony in its opinion.

The District Court also erred in finding that SMM did not commit fraud in failing to disclose to ATEL that it did not have the capability to market the Vessels despite its agreement that it would do so in the MBCA.[116]  Throughout the eight month negotiation of the MBCA, SMM never told ATEL that SMM did not have the ability to do the marketing[117] and that NWS, not SMM, would actually be marketing the Vessels.[118]  Despite this knowledge, SMM expressly represented to ATEL in the MBCA's that it would provide all marketing services for the Vessels.[119]  The MBCA's expressly provided that the management fee paid to SMM included compensation for marketing services.  ATEL was never informed that SMM

---

[115] Plaisance, T.Tr., ROA 11602-11603, 11689, 11691.
[116] ROA 11089-11090.
[117] Plaisance, T.Tr., ROA 11547-11548; Monroe, T.Tr., ROA 11708.
[118] Plaisance, T.Tr., ROA 11547-11548, 11642.
[119] Dewitt, T.Tr., ROA 11786-11787.

was being paid for services it could not and was not performing or that it was paying twice for these services.[120]

Further and as discussed *infra*, the District Court's factual finding that ATEL's failure to conduct due diligence as to the manner in which SMM typically chartered and marketed its vessels is fatally flawed.[121]   Although ATEL conducted thorough due diligence of SMM, no amount of due diligence would have revealed SMM's inability to market the Vessels since SMM initially directly invoiced and collected payment from the End-Users, failed to notify ATEL that NWS and not SMM would market the ATEL Vessels, and continued to report to ATEL that the charterers of the ATEL Vessels were the End-Users and not NWS.[122]   As such, it is clear that SMM actively concealed its inability to market the Vessels in an attempt to deceive ATEL.

In order to state a claim for negligent misrepresentation, a plaintiff must allege that: (1) the defendant, in the course of its profession, supplied false information to the plaintiff for a business transaction; (2) the defendant failed to exercise reasonable care in gathering the information; (3) the

---

[120] Plaisance, T.Tr., ROA 11547-11548.
[121] ROA 11089-11090.
[122] Plaisance, T.Tr. ROA 11591, 11594, 11621, 11641-11642; Monroe, T.Tr. ROA 11708, 11714-11715

plaintiff relied on the information for the transaction that was intended by the defendant; and (4) the plaintiff suffered a resulting pecuniary loss.[123]

SMM should have known of the 10% fee being charged by NWS. Plaisance knew of Isenberg's 10% skimming scheme when he received on-charter forms that showed a higher rate being charged to the End User than was being reported to ATEL.[124] When Plaisance inquired into the reason for the discrepancy, he began receiving on-charter forms in which the higher rate was blacked out.[125] The fraudulent scheme was also discussed in an Investco/SMM board meeting, at which time Plaisance objected to the scheme on the grounds that this was not the arrangement that had been negotiated with ATEL.[126] After Plaisance objected, he was told by DeWitt that this is the way that the marketing was going to be carried out. Plaisance knew or should have known that the skimming was ongoing. Plaisance did not inquire further into the issue and failed to disclose the "marketing arrangement" to ATEL.

---

[123] *Hale Container Line, Inc. v. Houston Sea Packing Co., Inc.,* 137 F.3d 1455, 1471 (citing *Coastal (Bermuda) Ltd. v. E.W. Saybolt & Co., Inc.,* 826 F.2d 424, 428-429 (5th Cir.1987), reh'g denied, citing *Grass v. Credito Mexicano, S.A.,* 797 F.2d 220 (5th Cir.1986), cert. denied, 480 U.S. 934, 107 S.Ct. 1575, 94 L.Ed.2d 766 (1987) for the requirements to state a cause of action for negligent misrepresentation under Restatement (Second) of Torts § 552 (1977).

[124] Plaisance, T.Tr., ROA 11619, 11689.

[125] Plaisance, T.Tr., ROA 11602-11603, 11682, 11689.

[126] Plaisance, T.Tr., ROA 11500-06; DeWitt, T.Tr., ROA 11876-11878.

SMM, ATEL's agent and fiduciary, had a duty to disclose to ATEL any knowledge of additional revenue being earned by the Vessels and not being paid to ATEL in violation of the MBCA. This duty was clearly breached when SMM failed to exercise reasonable care in gathering known and readily available information regarding the fraudulent scheme.

The evidence at trial established that SMM and NWS committed fraud, intentional misrepresentation, and/or negligent misrepresentation through the above conduct upon which ATEL relied and which resulted in damages to ATEL in the amount of $2,873,508.00. To find otherwise based on the evidence is clearly erroneous.

## POINT II

## THE DISTRICT COURT MISINTERPRETED THE MBCA

The District Court erroneously interpreted numerous provisions of the MBCA in finding that subchartering was allowed under the MBCA, that marketing was an "other service" for which NWS was allowed to provide and charge a customary under the MBCA, that SMM's duty to market and time charter the Vessels was discharged simply by blindly chartering all of the vessels to NWS, and that the contract did not require SMM to use its commercially reasonable efforts to attain commercially reasonable rates for the chartering of the Vessels. These erroneous interpretations of the MBCA

pervaded the District Court's reasoning and tainted many of the District Court's factual findings.

"A charter agreement for a vessel is a maritime contract, to be construed according to maritime law."[127]  Under the General Maritime Law, the contract must be read as a whole and the words must be given their plain meaning.[128]  "Courts must construe a charter according to the intent of the parties as manifested by the whole instrument..."[129]  Moreover, "the charter must be construed to make sense and to reflect the intent of the contracting parties."[130]  The interpretation of a contract and the determination of ambiguities are questions of law that are reviewable *de novo* on appeal.[131]

A reading of the plain language of the MBCA as a whole reveals that not only was the entire subchartering arrangement between NWS and SMM not allowed under the MBCA, but also that SMM breached many provisions of the MBCA.  Accordingly, the District Court's findings that SMM did not

---

[127] *Bourg v. Chevron U.S.A. Inc.,* 91 F.3d 141 (5th Cir. 1996).

[128] *Weathersby v. Conoco Oil Co.,* 752 F.2d 953, 955 (5th Cir. 1984).

[129] *See, e.g., Nitram, Inc. V. MV Cretan Life,* 599 F.2d 1359, 1368-69 (5th Cir. 1979)(emphasis added).

[130] *Wilson v. Job, Inc.,* 958 F.2d 653, 657 (5th Cir. 1992)(emphasis added).

[131] *See Abbott v. Equity Group, Inc.,* 2 F.3d 613, 626 (5th Cir.1993) (citing *Carter v. BRMAP,* 591 So.2d 1184, 1188 (La.Ct.App.1991)); *Patterson v. City of New Orleans,* 686 So.2d 87, 90 (La.Ct.App.1996); *American Totalisator Co., Inc. v. Fair Grounds Corp.,* 3 F.3d 810, 813 (5th Cir.1993); *Thrift v. Hubbard,* 44 F.3d 348, 357 (5th Cir.1995).

breach the MBCA and that NWS could subcharter the ATEL Vessels to End-Users at higher rates should be reversed.

## POINT II(A)

## THE TYPE OF SUBCHARTERING AGREEMENT ENTERED INTO BETWEEN NWS AND SMM WAS NOT ALLOWED UNDER THE TERMS OF THE MBCA

Early in this litigation, the District Court erroneously found that "NWS's practice of subchartering did not violate the MBCA because the right of a charterer to sublet a vessel is implied unless the charter contains an express provision forbidding subcharters."[132]   This erroneous finding permeates the District Court's Judgment and Reasons dismissing ATEL's claims as many of the Court's finding regarding these claims were based primarily, if not solely, on the prior finding that NWS was allowed to further subcharter the Vessels at higher rates since the MBCA did not expressly exclude subchartering.[133]

ATEL does not contend that all subchartering was prohibited under the terms of the MBCA.  In fact, the primary purpose of the MBCA was to allow SMM to subcharter the Vessels to End-Users as demonstrated in the recitals of the MBCA which clearly state that "[SMM] will … time charter

---

[132] ROA 3534.
[133] *See* ROA 11060-11095.

the Vessels, pursuant to the terms and conditions hereof."[134]   However, the

MBCA expressly limits the types of subchartering allowed.   The MBCA

only provides for the subchartering of the Vessels by SMM directly to the

End-Users and does not allow further subchartering by the End-Users or

time charterers.

Under the General Maritime Law, subchartering is generally allowed

unless it is prohibited by the terms of the original charter.[135]   However, all

such subsequent subcharters must comply with and cannot deviate from the

terms of the original charter.[136]   In its initial examination of whether SMM

breached the MBCA when entering into the MTCA with NWS, the District

Court failed to consider this second and equally important rule of law

requiring compliance with the original charter.[137]

The terms of the MBCA also expressly require any subsequent charter

to comply with the MBCA.   Article 3(b) of the MBCA provides that

> any time charter shall be in compliance with the
> terms and conditions of this Charter **and** the form
> of such time charter shall be subject to the prior
> approval of ATEL, except to the extent of a time
> charter with an entity identified on Schedule II, in
> such case the time charter shall be provided to

---

[134] Exhibits P-1 and P-2, MBCA, p. 1.
[135] BENEDICT'S ON ADMIRALTY § 185 (7th Ed. 2008) (citing *The Ely,* 110 Fed. 563, 570 (S.D. N.Y. 1901, affirmed 122 F. 447 (2d Cir. 1903), cert denied 189 U.S. 514 (1903)).
[136] *Id.*
[137] ROA 3534.

ATEL at the time of the collateral assignment thereof.[138] (Emphasis added)

The District Court erroneously found that this provision exempted the MTCA between NWS and SMM from complying with the terms of the MBCA. This provision of Article 3(b) requires two things. First, **all** subsequent charters must be in compliance with the terms of the MBCA. Second, subsequent charters must be pre-approved by ATEL, unless the charterer is found in Schedule II. As Schedule II is a list of pre-approved End-Users,[139] it is logical that the form of these charters would not have to be preapproved by ATEL but were to be provided at the time of assignment. What is not logical is an interpretation of this provision that would allow SMM to contract with charterers, even if preapproved, under any terms SMM desired. Such an interpretation would render the MBCA meaningless and contrary to the terms of the MBCA taken as a whole.

Although the MBCA does not expressly prohibit subchartering, there are multiple provisions that, when read as a whole, clearly show that it was the intent of SMM and ATEL that the Vessels would be subchartered by SMM directly to the End-Users and that no further subchartering would be allowed. First, Articles 3(b) and 6(b)(i) expressly state that SMM is to be

---

[138] Exhibits P-1 and P-2, MBCA, p. 4; ROA 10579.
[139] Plaisance, T.Tr., ROA 11589.

responsible for the solicitation, bidding, and negotiation of time charters.[140] This time chartering service was one of the services that were expressly covered by the Management Fee paid by ATEL to SMM.[141] The MBCA did not contemplate that SMM would simply charter all of the Vessels to a single entity, its sister company NWS. If it had contemplated such an arrangement, there would be no need for a Schedule II which listed approximately eighty (80) pre-approved End-Users.[142] Instead, NWS would have been the only name on Schedule II. An interpretation of the MBCA that would allow for SMM to simply blanket charter the Vessels to a single party would render Schedule II superfluous, and such an interpretation cannot be "construed to make sense and reflect the intent of the contracting parties."[143]

The MBCA also provided that "*[a]ny and all charters or other contractual relationships* entered into with respect to the use of the Vessels shall be in the name of [SMM]."[144] The Court erroneously interpreted this provision to mean that only those charter agreements entered into by SMM, in this case the MTCA, were required to be entered into in SMM's name. It

---

[140] Exhibits P-1 and P-2, MBCA, pp. 3 and 13.
[141] Exhibits P-1 and P-2, MBCA, p. 13.
[142] Exhibits P-1 and P-2, MBCA, pp. 32-33.
[143] *Wilson v. Job, Inc., Supra*
[144] Exhibits P-1 and P-2, MBCA, p. 16.

is axiomatic that any time charter that SMM enters into must be in its name. To limit this provision to only those time charters that SMM entered into would render this provision meaningless. It is clear that the plain language of this provision intended to grant the sole and exclusive right to enter into any and all charters for the use of the Vessels to SMM. Accordingly, SMM's entering into the MTCA with NWS violated the terms of the MBCA insofar as the MTCA allowed NWS to enter into charters for the use of the ATEL Vessels in the name of NWS.

The MBCA also required that SMM "collect all time charter hire and other revenue earned from the operation of the Vessels,"[145] that "all accounts receivable arising from the time chartering of the Vessels shall be remitted to [SMM],"[146] and that "[SMM] shall issue invoices to time charterers of the Vessels for time charter hire and other amounts payable for use of the Vessels."[147] Again, the unambiguous language of these provisions provide that SMM was responsible for invoicing and collecting payment for all time charters entered into by the Vessels. These provisions, when read as a whole, clearly demonstrate that the MBCA did not allow for the type of subchartering arrangement entered into by SMM and NWS. The MBCA

---

[145] Exhibits P-1 and P-2, MBCA, p. 16.
[146] Exhibits P-1 and P-2, MBCA, p. 17.
[147] Exhibits P-1 and P-2, MBCA, p. 15.

intended for SMM to be the sole party entering into time charters of the Vessels and collecting revenue earned by the Vessels. Indeed, SMM's Management Fee covered these very services.[148]

It was initially contemplated by NWS and SMM that NWS would act as a "sales agent" for the ATEL Vessels and would not be involved in the time chartering, invoicing, or collection process.[149] This arrangement would have complied with the terms of the MBCA as it would have allowed SMM to directly enter into time charters with End-Users and SMM would have directly received 100% of all payment from the End-Users, which payment would have been provided to ATEL.[150] Indeed, when the Vessels first went into service, SMM initially issued all invoices to End-Users, received all payment from End-Users, and deposited all revenue in the Lockbox in strict compliance with the terms of the MBCA.[151]

It was not until Isenberg instructed DeWitt to implement the skimming scheme that the ATEL Vessels were marketed in violation of the MBCA.[152] This scheme led to the execution of the MTCA between NWS

---

[148] Exhibits P-1 and P-2, MBCA, p. 13.
[149] Exhibit P-10, November 30, 2004 Email Chain from DeWitt's Assistant to Lank; DeWit, T.Tr., ROA 11851-11855.
[150] Exhibit P-10, November 30, 2004 Email Chain from DeWitt's Assistant to Lank; DeWit, T.Tr., ROA 11851-11855.
[151] Plaisance, T.Tr., ROA 11591; Exhibit P-22, Summary of M/V CAPE KALA KANE Charter Amounts.
[152] DeWitt, T.Tr., ROA 11860-11863.

and SMM.  It is clear that SMM breached the terms of the MBCA by implementing  the skimming scheme when SMM entered into the MTCA and began allowing NWS to charter the Vessels under the MTCA.

Had SMM continued to charter the Vessels as they were initially being chartered and in compliance with the terms of the MBCA, SMM would have continued to collect 100% of the revenue earned by the ATEL Vessels and paid the same to ATEL.  SMM's breach of the MBCA by entering into the noncompliant MTCA directly resulted in the loss of revenue by ATEL in the amount of $2,873,508.00.[153]

### POINT II(B)

### NWS' MARKETING OF THE ATEL VESSELS WAS NOT AN "OTHER SERVICE" PERMITTED UNDER ARTICLE 13 OF THE MBCA

The District Court erroneously found that NWS' marketing of the Vessels was a service that was allowed to be delegated under the terms of the MBCA.[154]  Article 13 of the MBCA provides as follows:

> It is understood and agreed by the parties hereto that **in addition to performing services for which Sea Mar will receive Management Fees**, Sea Mar, either directly or through its affiliated companies or designees, may perform **other services** (including without limitation maintenance

---

[153] The parties stipulated that NWS retained an additional $2,873,508.00 from the charter of the ATEL Vessels from July 2004 to August 2007. ROA 10586.
[154] ROA 11086-11087.

and repair services), and may supply materials, equipment and supplies (including without limitation repair and replacement of parts, material, equipment and supplies) as are necessary for the operation of the vessels.  Sea Mar shall provide such services, material, equipment and supplies at commercially reasonable rates and industry-standard pricing and **shall provide ATEL documentation in support thereof**.  Such services, materials, equipment and supplies **shall be deemed ATEL expenses hereunder provided that** (1) such expenses shall be billed at Sea Mar's cost, but in any event, not greater than commercially reasonable rates and industry-standard pricing; and (2) **shall be disclosed by Sea Mar to ATEL on Schedule III hereof, in the written records, monthly reports, and invoices to ATEL** at the time of the reimbursement, as being amounts reimbursed directly to Sea Mar for materials or services provided by Sea Mar; and (3) shall be subject to all other requirements of Operating Costs under Article 3 hereof.[155]

The clear and unambiguous terms of the MBCA provide that "other services" are those services "in addition to … services for which [SMM] will receive Management Fees."  The only rational interpretation of this provision is that "other services" do not and cannot include those services for which SMM is already being paid a Management Fee, which services expressly include marketing. [156]  As such, marketing services do not qualify as "other services" under Article 13.  The clear and unambiguous intent of

---

[155]Exhibits P-1 and P-2, MBCA, pp. 26-27; ROA 10581.
[156] Exhibits P-1 and P-2, MBCA, pp. 13-14.

Article 13 is simply to provide a mechanism whereby SMM could bill ATEL for unforeseen expenses that arose in connection with the operation of the Vessels and that were not listed in the MBCA; not for marketing services which were expressly provided for in the MBCA as part of the duties covered by the Management Fee.

A consequence of this clearly erroneous interpretation of this provision that would allow NWS to separately charge ATEL for services for which SMM is already being compensated would result in ATEL paying twice for the same marketing services. ATEL paid SMM approximately $1.6 million over two and one-half years to provide marketing and other services for the Vessels in addition to paying all operating expenses of the Vessels.[157] It is inconceivable that ATEL should have to pay twice to two related entities for a service that was negotiated and included in the original MBCA. Even more outrageous is Defendants' argument that the 10% of the charter hire skimmed by NWS, almost $3 million, and which equals nearly 200% over what ATEL agreed to pay SMM in Management Fees, was reasonable compensation for the "marketing services" rendered by NWS for which DeWitt initially valued at $50 per day, or less than 10% of what NWS ultimately skimmed.

---

[157]Exhibit P-29, ATEL Account Financial Reports.

## POINT II(C)

### SMM'S BLANKET CHARTERING OF THE ATEL VESSELS TO NWS DID NOT SATISFY ITS TIME CHARTERING/MARKETING OBLIGATIONS UNDER THE MBCA

Under Article 1 of the MBCA, SMM was obligated to "manage, operate, maintain, oversee and supervise the time chartering, crewing, provisioning, maintenance, storage and repair of the [ATEL] vessels."[158] Article 3(b) of the MBCA further provided that "SMM shall be responsible for the solicitation, bidding and negotiation of time charters."[159] Under Article 6 of the MBCA, SMM was to be paid a Management Fee which was was to cover "(i) **...the solicitation, bidding and negotiation of such time charters;** [and] … (iv) … such reasonable and customary accounting, clerical, **marketing** and personnel services as are generally performed by [SMM] and as are required to efficiently conduct the business affairs of the Vessels." [160]

The District Court erroneously held that SMM did not breach the MBCA in transferring its marketing obligations to NWS because the MBCA did not prohibit subchartering and NWS was a pre-approved charterer under

---

[158] Exhibits P-1 and P-2, MBCA, pp. 1-2; ROA 10579.
[159] Exhibits P-1 and P-2, MBCA, p. 3; ROA 10579.
[160]Exhibit P-1 and P-2, MBCA, pp. 12-14; ROA 10580.

Schedule II of the MBCA.[161]  As shown *supra,* the MBCA did not allow for the type of subchartering arrangement entered into between NWS and SMM. Further, as testified to by Plaisance[162] and as demonstrated by the collective terms of the MBCA, the list of pre-approved charterers found in Schedule II was intended to set forth those End-Users to whom SMM was going to charter the ATEL Vessels, not those parties to whom SMM could pass its marketing and time chartering obligations while still being paid a Management Fee by ATEL.

The undisputed evidence clearly established that SMM, despite agreeing to market and time charter the Vessels, never had the capability of doing so and therefore breached the MBCA.[163]  Further, Plaisance readily admitted that SMM was never going to be overseeing and supervising the time charters for the Vessels as SMM always knew that NWS would be performing those services, yet did not disclose this to ATEL.[164]  It is undisputed that SMM did not at any time solicit, bid or negotiate time charters with the End Users of the Vessels in clear breach of the terms of the MBCA.  Had SMM fulfilled its contractual obligations and directly chartered the ATEL Vessels to the End-Users, no 10% markup would have

---

[161] ROA 11077-11078.
[162] Plaisance, T.Tr., ROA 11589-11590.
[163] Dewitt, T.Tr., ROA 11844, 11899.
[164] Plaisance, T.Tr., ROA 11549-11550, 11565-11570.

been possible.  Instead, *ATEL ended up paying twice for the same marketing services*.

The District Court further incorrectly interpreted the MBCA to provide that SMM was only required to market and time charter the ATEL Vessels in the same manner as other vessels operated by SMM.[165]  Article 3 of the MBCA sets forth the various duties that SMM is obligated to provide.[166]  Article 3(b) provides that SMM is required to solicit, bid, and negotiate <u>all</u> time charters.[167]  Article 3(b) does not contain any language modifying, qualifying, conditioning, or limiting SMM's time chartering obligations.

Article 3(j) sets forth "General Duties and Operating Costs" for which SMM is also responsible and provides that SMM "shall provide general and administrative services … including, but not limited to … such reasonable and customary accounting, tax, clerical, marketing and personnel services as are generally performed by [SMM] for other vessels owned or operated by [SMM]."[168]  The only reasonable interpretation of Article 3(j), when reading the MBCA and Article 3 as a whole, reveals that this provision is simply a catch-all provision intended to cover those obligations that are not expressly

---

[165] ROA 11081-11082.
[166] Exhibits P-1 and P-2, MBCA, pp. 2-8.
[167] Exhibits P-1 and P-2, MBCA, p. 3.
[168] Exhibits P-1 and P-2, MBCA, p. 8.

set forth elsewhere in Article 3 yet are nevertheless necessary to successfully carry out the chartering of the ATEL Vessels. The "as generally performed" language in Article 3(j) is not intended to modify SMM's obligations contained elsewhere in the MBCA.

The District Court's strained interpretation of the MBCA would require a finding that the parties, after eight months of negotiations, agreed to terms that require them to assume facts that were not known by ATEL and are not memorialized in the MBCA. It is clear that this was not the intent of the parties. Further, it was impossible for ATEL to determine the manner in which SMM was going to be marketing the ATEL Vessels prior to or following the execution of the MBCA. ATEL's due diligence would not have revealed the marketing arrangement between NWS and SMM since SMM was initially directly invoicing the End-Users when the Vessels first went into service.[169] SMM never disclosed to ATEL that SMM would not be marketing the Vessels to the End Users.[170] In fact, SMM actively and continuously misled ATEL when it communicated to ATEL that the charterer of the Vessels was the End-User, and not NWS.[171]

---

[169] Plaisance, T.Tr., ROA 11591.
[170] Plaisance, T.Tr., ROA 11549-11550.
[171] Plaisance, T.Tr. ROA 11594, 11621; Monroe, T.Tr., 11714-11715.

Even if the District Court's interpretation of Article 3(j) was proper, SMM did not market the Vessels through NWS in the same manner as other vessels that were operated by SMM. The fact that SMM time chartered both the Nabors Finance vessels and Vessels to NWS does not establish that the Vessels were in fact marketed in the same manner. The undisputed facts in this case show that NWS chartered other vessels operated by SMM at the best rate they could obtain in the market.[172] However, instead of keeping a 10% "fee," NWS kept the difference between the rates it received from the End-User and the flat fee that was owed to Nabors Finance plus the operating expense and the $100 management fee paid to SMM.[173] NWS's fee was thus determined by the market and was calculated at the end of the time charter when all expenses were "trued-up."

On the other hand, the "fee" that was retained by NWS from the charter of the Vessels was a consistent 10% of the charter hire and was pre-determined before the End-User charter agreement was executed. Under this arrangement, NWS had no risk. The Vessels were thus clearly not marketed in the same manner SMM marketed the Nabors vessels thereby resulting in SMM's breach of the MBCA.

---

[172] Dewitt, T.Tr., ROA 11808.
[173] Dewitt, T.Tr., ROA 11814-11815.

## POINT II(D)

## SMM DID NOT USE "COMMERCIALLY REASONABLE EFFORTS" TO MARKET THE ATEL VESSELS

Article 3(b) of the MBCA provided that SMM was required to "use its commercially reasonable efforts to obtain time charters for the [ATEL] Vessels."[174]  It is undisputed that SMM undertook **no** efforts to obtain time charters, much less commercially reasonable efforts.[175]  NWS obtained all time charters and negotiated and set all rates.[176]  SMM's obligation was clearly breached when SMM simply accepted the rate NWS told SMM it would be paid.

The District Court's reliance on Article 14 of the MBCA in finding that SMM was not under an obligation to obtain commercially reasonable rates is also misplaced.[177]  This provision relates to preferential treatment of other vessels operated by SMM and does not affect or modify SMM's obligations under Article 3.[178]

Underscoring SMM's breach of this provision, Dennis Auyeung, NWS' Vice President of Finance, testified that NWS would first obtain a time charter with the End User before a corresponding reduced-rate charter

---

[174] Exhibits P-1 and P-2, MBCA, p. 3.
[175] Plaisance, T.Tr., ROA 11568-11569.
[176] Plaisance, T.Tr.,  ROA 11591-11592.
[177] ROA 11078-11079.
[178] Exhibits P-1 and P-2, MBCA, p. 27.

was ever presented to SMM.[179]   When NWS marketed the Vessels, NWS

sought the best rates that the market would allow for NWS.[180]   According to

DeWitt, these rates were **market rates** the End Users were paying.[181]   After

entering into a time charter with the End User, NWS would then execute an

on-charter agreement with SMM for 10% less than the rate being obtained

from the End User.[182]   As the District Court indicated in its December 18,

2009 Order, "NWS's ability to immediately subcharter the boats at a higher

rate would imply that Sea Mar was not charging a market rate."[183]

Defendants' expert, Mark Compeaux, also testified that the rates that NWS

received for the chartering of the Vessels were the market rates at that

time.[184]   The fact that SMM was consistently earning 10% less in charter

hire than the market rate that NWS was obtaining from End Users on time

charters that were executed contemporaneously clearly proves that the

efforts used by SMM in obtaining the time charters from NWS **were not**

**commercially reasonable**.   They were in fact consistently 10% less than

commercially reasonable.   Indeed, SMM was in fact initially earning market

rates for the chartering of the Vessels, but later earned only 90% of these

---

[179] Aueyeung, T.Tr., ROA 12282-12283.
[180] Plaisance, T.Tr., ROA 11541.
[181] Dewitt, T.TrROA 11818.
[182] Aueyeung, T.Tr., ROA 12280-12283.
[183] ROA 3536.
[184] Compeaux, T.Tr., ROA 12261.

market rates once NWS began directly invoicing the End-Users and skimming 10% of all charter hire earned by the Vessels.[185]  Had SMM continued to use the same commercially reasonable efforts through which it began chartering the Vessels, SMM would have continued to earn commercially reasonable market rates.

While Compeaux testified that the rates NWS was receiving from the chartering of the Vessels were market rates, the Court should afford little weight to the Compeaux's testimony regarding whether the rates received by SMM were market rates.  Compeaux is a vessel broker whose knowledge is limited to vessel brokerage.[186]  As DeWitt testified, NWS did not act as a broker under the arrangement between NWS and SMM, but acted as a time charterer.[187]  Further, Compeaux's opinion is based on the limited facts that were provided to him by Defendants.  Compeaux *only reviewed the charter rates obtained by NWS for the Vessels, not the rates at issue here, the rates NWS paid to SMM*, when he opined that the rates were commercially reasonable market rates.[188]  Since Compeaux did not review any documents or information either detailing SMM's efforts in time chartering the Vessels or establishing the rates obtained by SMM, he had no basis to render an

---

[185] Plaisance, T.Tr., ROA 11591.
[186] Compeaux, T.Tr., ROA 12229.
[187] Dewitt, T.Tr., ROA 11847.
[188] Compeaux, T.Tr., ROA 12260-12262.

opinion on SMM's actions or whether the rates obtained by SMM were "commercially reasonable".

## POINT III

### ATEL SUFFERED DAMAGES AS A RESULT OF SMM'S BREACHES OF THE MBCA

The District Court found at least three breaches of the MBCA by SMM – 1) SMM failed to collaterally assign a security interest in the MTCA to ATEL,[189] 2) SMM failed to maintain records sufficient to account for the amounts retained by NWS,[190] and 3) SMM failed to disclose and report the amounts retained by NWS for its "marketing services" to ATEL.[191] However, the District Court found that ATEL did not suffer any damages as a result of these breaches and dismissed ATEL's claims for breach of contract. Additionally, although the District Court did not expressly find that SMM breached the MBCA by failing to directly invoice the End-Users, its only basis for dismissing this claim was that ATEL did not suffer any damages as a result of any potential breach.[192]

The Court's holding that ATEL did not suffer any damages as a result of the breach is manifestly erroneous. As addressed *supra*, ATEL would have been paid 100% of the revenue earned by the Vessels had SMM

---

[189] ROA 11080.
[190] ROA 11080-11081.
[191] ROA 11085-11087.
[192] ROA 11083-11084.

continued to directly invoice the End-Users as was initially done and required under the terms of the MBCA.

To prevail on its breach of contract claim against SMM, ATEL must prove:  (1) the terms of a maritime contract; (2) that the contract was breached; and (3) the reasonable value of damages caused by that breach.[193] The basic rule of contract remedies is that the plaintiff is to be put in the same position he would have occupied had the defendant performed his obligation.[194]   Gains prevented, as well as losses sustained, may be recovered as damages for a breach of contract, where they can be rendered reasonably certain by evidence, and have naturally resulted from the breach.[195]

Additionally, if SMM had collaterally assigned security interests in the MTCA and the End-User time charters, maintained records of the amounts retained by NWS, or disclosed these amounts to ATEL as required by the unambiguous terms of the MBCA, ATEL would have discovered the scheme and placed SMM in default and/or exercised its right of termination under Article 10 of the MBCA and contracted with another management

---

[193] *Exxon Corp. v. Cent. Gulf Lines, Inc.,* 500 U.S. 603, 605-06 (1991); *Krauss Bros. Lumber Co. v. Dimon S.S. Corp.,* 290 U.S. 117, 124 (1933).
[194] *Morris v. Homco Int'l, Inc.,* 853 F.2d 337, 346 (5th Cir. 1988).
[195] *Polar Steamship Corporation v. Inland Overseas Steamship Corporation,* 136 F.2d 835,  841 (4th Cir. 1943).

company who could have directly chartered the Vessels to End-Users and paid to ATEL 100% of the revenues earned by the Vessels as SMM did originally and as Hornbeck did following the sale of SMM to Hornbeck in compliance with the MBCA.[196] The District Court failed to consider evidence of ATEL's right of termination in finding that ATEL did not suffer damages as a result of SMM's breaches of the MBCA.

There is no evidence to suggest that NWS was particularly successful at obtaining high rates and utilization during this time period or that another company would not have had the same success. Indeed, the undisputed testimony elicited at trial shows that the market for vessels during a large portion of the time that the Vessels were being managed by SMM was "exploding" and experiencing increases in both rates and utilization due to the damage caused by Hurricane Katrina.[197] As such, as a direct result of SMM's failure to disclose the existence of the scheme to ATEL, ATEL was damaged in the amount of $2,873,508.00, which amount could have been obtained by and remitted to ATEL by an honest management company had ATEL terminated the MBCA. Because the parties have stipulated that NWS retained $2,873,508.00 from the subchartering of the ATEL Vessels, the

---

[196] Exhibits P-1 and P-2, MBCA, pp. 19-23; Plaisance, T.Tr., ROA 11591-11592, 11624-11625; Morais, T.Tr., ROA 12200-12201;.

[197] Plaisance, T.Tr., ROA 11627-11628; DeWitt, T.Tr., ROA 12073; Morais, T.Tr., ROA 12166.

Court must award damages in this amount plus contractual interest and attorneys' fees.

## POINT IV

### NWS AND SMM WERE ENGAGED IN A SINGLE BUSINESS ENTERPRISE

Louisiana Federal Courts sitting in admiralty have recognized and applied the concept of single business enterprise when determining whether to pierce the veil of a corporation.[198] "[Under the single business enterprise theory] the legal fiction of a distinct corporate entity may be disregarded when a corporation is so organized and controlled as to make it merely an instrumentality or adjunct of another corporation."[199] "Upon finding that a group of corporations constitute a "single business enterprise," the court may disregard the concept of corporate separateness to extend liability to each of the affiliated corporations *to prevent fraud or to achieve equity.*"[200] "The extension of liability for a corporation's obligations beyond the confines of its own separate entity is appropriate in those cases where an essentially single business or economic enterprise is nevertheless conducted through several separate corporations."[201] "When a group of corporations integrate their resources to achieve a common business purpose and do not operate as

---

[198] *In re Athena Construction, L.L.C.,* 2008 WL 3186743 (W.D. La. 2008).
[199] *Green v. Champion Ins. Co.,* 577 So.2d 249, 257 (La. App. 1 Cir. 1991).
[200] *Id.* at 259 (emphasis added).
[201] *Id.*

a separate entity, each affiliated corporation may be held liable for debts incurred in pursuit of its business purpose."[202]

It is clear in this case that NWS, Investco and SMM (the "Sea Mar Entities") integrated their resources to achieve a common business purpose; namely, to collectively operate and market vessels, initially in an attempt to skirt or circumvent the U.S. Coast Guard/Jones Act foreign ownership restrictions, and later to earn profit from the chartering of the ATEL Vessels. Prior to the "inversion," the Sea Mar Entities were operated as a single subsidiary corporation within the Nabors corporate family. Sea Mar Management, Inc. owned, operated and marketed all Nabors vessels within a single business unit.[203]  After the inversion, Sea Mar Management, Inc. could no longer operate the Nabors vessels in coastwise trade because it was now considered a foreign company and was prohibited from doing so by U.S. law.[204]  To get around this legal hurdle, Nabors divided Sea Mar Management, Inc. into SMM, Nabors Finance and Sea Mar Division of Nabors Well Service.  Each of the Sea Mar Entities was tasked with providing certain services for the Nabors vessels all of which were previously performed by Sea Mar Management, Inc.  Nabors Finance owned

---

[202] *Id.*

[203] Plaisance, T.Tr., ROA 11526.

[204] Plaisance, T.Tr., ROA 11526; Doerre, T.Tr., ROA 11988-11994.

the vessels, NWS marketed the vessels, and SMM operated the vessels.[205]

However, the overall function of the enterprise did not change.

Whether an affiliated group of entities constitutes a "single business enterprise" ("SBE") is a question of fact to be decided by the trial court.[206] The following factors are considered when determining whether a group of entities constitutes a SBE:

> 1) corporations with identity or substantial identity of ownership, that is, ownership of sufficient stock to give actual working control;  2) common directors or officers; 3) unified administrative control of corporations whose business functions are similar or supplementary; 4) directors and officers of one corporation act independently in the interest of that corporation; 5) corporation financing another corporation; 6) inadequate capitalization ("thin incorporation"); 7) corporation causing the incorporation of another affiliated corporation; 8) corporation paying the salaries and other expenses or losses of another corporation; 9) receiving no business other than that given to it by its affiliated corporations; 10) corporation using the property of another corporation as its own; 11) noncompliance with corporate formalities; 12) common employees; 13) services rendered by the employees of one corporation on behalf of another corporation; 14) common offices; 15) centralized accounting; 16) undocumented transfers of funds between corporations; 17) unclear allocation of profits and losses between corporations; and 18)

---

[205] Plaisance, T.Tr., ROA 11528; Dewitt, T.Tr., ROA 11785, 11826; Doerre, T.Tr., ROA 11988.

[206] *Oracle 1031 Exchange, LLC v.* Bourque, 2012 WL 385115 (La. App. 3 Cir. 2/8/12); *Green v. Champion Ins. Co.,* 577 So.2d 249, 257 (La. App. 1 Cir., 1991).

excessive fragmentation of a single enterprise into separate corporations.[207]

The above list is only illustrative, and no single factor is dispositive of the issue of whether a SBE exists.[208]

The District Court's determination that NWS and SMM were not engaged in a single business enterprise was manifestly erroneous. The District Court focused primarily on the relationship of NIL to NWS and SMM and gave very little consideration to the symbiotic relationship between NWS and SMM.[209] The overwhelming evidence at trial demonstrated that despite the facade of separateness, SMM and NWS operated as a single business enterprise as concerns both the Nabors Finance and ATEL Vessels. As a result, a judgment in ATEL's favor against one of the defendants should serve as a judgment against all.

The undisputed evidence also clearly showed that NWS and SMM had unified administrative control of supplementary business functions as they worked hand-in-hand in the vessel business. SMM managed and bareboat chartered all vessels that were time chartered by NWS. In turn, NWS time chartered all vessels that were managed by SMM. SMM did not charter to and NWS did not charter from any other companies. In fact, NWS

---

[207] *Green v. Champion Ins. Co.,* 577 So.2d at 257-258.
[208] *Id.*
[209] ROA 11069-11076.

and SMM took great effort to appear as one entity to the marine industry. SMM did not want to market vessels at the same time that NWS was marketing vessels because they "didn't want to compete amongst ourselves."[210]    According to Plaisance, this competition could lead to "confusion in the industry with our customers."[211]    NWS and SMM desired to have one person and one number for their customers to contact.[212]    NWS and SMM used the same SMM logo letterhead which logo was also painted on the hull of the Vessels.[213] Defendants' own expert, Mark Compeaux, testified that he considered all Sea Mar Entities as one and the same.[214]

SMM was wholly owned by Investco and all of SMM's profits were swept into Investco's bank account.[215]    Investco was just a shell and had no employees and was set up solely to "own" SMM.[216]    Investco was owned 75% by the Jesselson interests (Michael Jesselson was a U.S. citizen and a long-time family friend of Isenberg) and ultimately 25% by NIL through a series of subsidiaries.[217]    NIL ultimately owned 100% of NWS.[218]    Although

---

[210] Plaisance, T.Tr., ROA 11551.

[211] Plaisance, T.Tr., ROA 11551.

[212] Plaisance, T.Tr., ROA 11551.

[213] Exhibit P-6, December 10, 2004 Memo from SMM Board of Directors; Plaisance, T.Tr., ROA 11542, 11607-11608.

[214] Plaisance, T.Tr., ROA 12252-12253.

[215] ROA 10583.

[216] Doerre, T.Tr. ROA 12027.

[217] Powell, T.Tr., ROA 12308.

[218] ROA 132-133.

NIL was only a minority owner of Investco (and therefore of SMM) on paper, in reality NIL, through NWS, controlled the business operations of SMM. Accordingly, both NWS and SMM were commonly owned by the same ultimate parent corporation, NIL, and operated such that NIL had actual working control over both entities, which control was exercised by NIL's representative, DeWitt.

The board of managers of Investco consisted of Dewitt, Jesselson and Jesselson's assistant, Judy Kelly. Dewitt was the representative of Nabors' 25% ownership interest, *although DeWitt was unsure of the Nabors entity that he was actually representing.*[219] DeWitt was also the president of NWS.[220] The SMM board of managers was comprised of Jesselson, Kelly, Plaisance and Powell.[221] Although DeWitt was not on the board of SMM, he did not characterize discussions regarding SMM and Investco separately, but considered them to concern "Sea Mar Management business in general."[222] Because DeWitt was both an officer of NWS and on the board of Investco, which managed all of SMM's business, it is clear that NWS and Investco/SMM shared common officers and/or directors.

---

[219] Dewitt, T.Tr., ROA 11787, 11801.
[220] Dewitt, T.Tr., ROA 11776-11777, 11937-11938.
[221] Dewitt, T.Tr., ROA 11787-11788.
[222] Dewitt, T.Tr., ROA 11872.

Although Jesselson was the President of SMM, Jesselson "wasn't involved in day-to-day operations at all."[223] Jesselson "would normally agree with what the other members of the board decided" which were DeWitt and Plaisance.[224] The Investco board signed off on all policy and budget issues concerning SMM as SMM's operating agreement specifically provided that Invesco had "the exclusive right to manage . . . [SMM's] . . . business."[225] Investco and SMM held joint board meetings.[226] Plaisance and Powell typically attended the board meetings of Investco.[227] DeWitt also attended every SMM board meeting.[228] DeWitt, an employee of NWS, gave SMM officers instructions regarding the management of SMM at the Investco/SMM board meetings.[229] DeWitt instructed SMM on where the boats worked, when jobs were to start, and how to prepare for jobs.[230] Further, NWS instructed SMM as to the rates that were to be charged to End Users.[231] It is clear from the evidence presented at trial that Jesselson was a "straw man" and that the real person running the operations of

---

[223] Plaisance, T.Tr., ROA 11538.
[224] Powell, T.Tr., ROA 12309.
[225] ROA 10511; Dewitt, T.Tr., ROA 11804.
[226] Dewitt, T.Tr., ROA 11788.
[227] Dewitt, T.Tr., ROA 11789.
[228] Plaisance, T.Tr., ROA 11636-11637.
[229] Plaisance, T.Tr., ROA 11681-11682.
[230] Plaisance, T.Tr., ROA 11538-11539.
[231] Plaisance, T.Tr., ROA 11591.

Investco/SMM was DeWitt through the directives of Isenberg thus further establishing that NWS and SMM were operated under a unified administrative control.

SMM was also undercapitalized. In fact, when SMM was formed it had no capital. [232] NWS paid all of SMM's expenses incurred in operating the Nabors vessels and paid SMM a management fee of $100/day per vessel for its services.[233] NWS fronted the money necessary for SMM's operations to SMM each month. [234] The operations of SMM/Investco were never properly capitalized and SMM/Investco was only provided enough funds, on a short term basis, to continue operation. Further, NWS was the only company that time chartered vessels from SMM and all of SMM's income was received through its time charter agreements with NWS thus clearly demonstrating that NWS financed 100% of SMM's operations.[235]

SMM and NWS also utilized common offices in the performance of their business. Although SMM's office was located in New Iberia, all of the offices of the remaining Nabors entities, including Investco, which controlled the management of SMM, and NWS were located in the same

---

[232] Powell T. Tr., ROA 12313.
[233] Plaisance, T.Tr., ROA 11529; Dewitt, T.Tr., ROA 11795-11796; Exhibit P-28, Sea Mar's Organizational Corporate Structure.
[234] Plaisance, T.Tr., ROA 11530; 11532.
[235] Dewitt, T.Tr., ROA 11819-11820.

building in Houston, Texas.[236]   Additionally, SMM's corporate operations were directed from Nabors' Houston offices.   SMM often had board meetings at Nabors' Houston office.[237]   The offices of Investco and its board member, DeWitt, were also located in Nabors' Houston office.  It is apparent that Nabors' Houston office was the nerve center for all of the operations of the Sea Mar entities.

It is clear that the undisputed facts established at trial when applied to the single business enterprise factors set forth above weigh heavily in favor of the existence of a single business enterprise between NWS and SMM. Accordingly, if either party is found liable for damages to ATEL as a result of SMM's breach of the MBCA or either party's tortious conduct, this liability should be imputed to the remaining party as well.

## POINT V

### NWS' RETENTION OF THE ADDITIONAL 10% OF REVENUE EARNED BY THE ATEL VESSELS THAT WAS CONCEALED FROM ATEL CONSTITUTES CONVERSION

"A conversion consists of an act in derogation of the plaintiff's possessory rights, and any wrongful exercise or assumption of authority over another's goods, depriving him of the possession, permanently or for an

---

[236] Dewitt, T.Tr., ROA 11836; Doerre, T.Tr., ROA 12025.
[237] Powell, T.Tr., ROA  12311-12312, 12318.

indefinite time, is a conversion."[238]   In order for ATEL to prevail on its

claim of conversion, ATEL must prove that it was entitled to possession of

the disputed property – in this case, the amounts retained by NWS.[239]

The District Court based its dismissal of ATEL's conversion claim

solely on its finding that ATEL was not entitled to the amounts retained by

NWS from the subchartering of the ATEL Vessels at rates 10% higher than

those reported to ATEL since the MBCA did not prohibit subchartering and

NWS was not a party to the MBCA.[240]   As discussed *supra,* the clear and

unambiguous terms of the MBCA precluded SMM and NWS from engaging

in the type of subchartering arrangement into which they entered.  As such,

ATEL is entitled to possession of any amounts earned through the MTCA,

which was entered into in violation of the MBCA and in derogation of

SMM's duties, since these amounts should have rightfully been paid to

ATEL.   NWS converted funds owed to ATEL in the amount of

$2,873,508.00.

## CONCLUSION

The final judgment should be reversed and judgment should be

entered in favor of ATEL in the amount of $2,873,508.00, plus pre- and

---

[238] *Quealy v. Paine, Webber, Jackson & Curtis, Inc.,* 475 So.2d 756, 760 (La. 1985).
[239] *Occidental of Umm al Qaywayn, Inc. v. A Certain Cargo of Petroleum Aboard the Tanker Dauntless Colocotronis,* 577 F.2d 1196, 1202 (5th Cir. 1978).
[240] ROA 11090-11091.

post-judgment interest or, alternatively, reversed and remanded to the District Court.

This 14th day of November, 2013.

Respectfully submitted,

*/s/ Glenn G. Goodier*

GLENN G. GOODIER (#06130) – Lead Counsel
CHRISTOPHER S. MANN (#26397)
MATTHEW S. LEJEUNE (#32552)
Jones Walker LLP
201 St. Charles Avenue, 48th Floor
New Orleans, Louisiana 70170-5100
Telephone:  (504) 582-8332
Facsimile:   (504) 589-8332
E-mail:ggoodier@joneswalker.com
E-mail: cmann@joneswalker.com
E-mail:mlejeune@joneswalker.com
*Attorneys for Appellants, ATEL Maritime Investors, LP, ATEL Maritime Investors, III, LP, and Kalakane, LLC*

## CERTIFICATE OF SERVICE

I do hereby certify that I have on this 14th day of November, 2013 served a copy of the foregoing pleading on counsel for all parties to this proceeding by electronic filing and by mailing the same by United States mail, properly addressed and first class postage prepaid.

/s/ Glenn G. Goodier
GLENN G. GOODIER
Lead Counsel for
Appellants, ATEL Maritime
Investors, LP, ATEL Maritime
Investors, III, LP, and Kalakane, LLC

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1.   This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

> This brief contains 13,649 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

> This brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2003 in Times New Roman - 14 point.

*/s/ Glenn G. Goodier*
GLENN G. GOODIER
Lead Counsel for Appellants, ATEL Maritime Investors, LP, ATEL Maritime Investors, III, LP, and Kalakane, LLC