------------------------------
**CASE NO. 13-30790**
------------------------------

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

------------------------------------------------------------------------

## ATEL MARITIME INVESTORS, L.P.; ATEL MARITIME INVESTORS, III, L.P.; KALAKANE, L.L.C., formerly known as Kala Kane, L.L.C.,

**Plaintiffs – Appellants**
**v.**

## SEA MAR MANAGEMENT, L.L.C.; NABORS WELL SERVICES COMPANY; NABORS INDUSTRIES, LIMITED,

**Defendants – Appellees**
------------------------------------------------------------------
**On Appeal from the United States District Court
For the Eastern District of Louisiana**
------------------------------------------------------------------

ORIGINAL BRIEF OF APPELLEES SEA MAR MANAGEMENT LLC
AND NABORS WELL SERVICES CO.
_____

Thomas J. Smith (LA# 17148), - LEAD COUNSEL
Amanda E. Kurz (*Pro Hac Vice*) (TX# 24065578)
GALLOWAY, JOHNSON, TOMPKINS,
BURR & SMITH
One Shell Square- 40th Floor
701 Poydras Street
New Orleans, Louisiana 70130
Telephone:   (504) 525-6802
Facsimile:   (504) 525-2456
E-mail:      tsmith@gjtbs.com
E-mail:      akurz@gjtbs.com
*Counsel for Appellees, Nabors Well Services Co., and
Sea Mar Management, LLC*

-----------------------------
**CASE NO. 13-30790**
-----------------------------

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

---------------------------------------------------------------------

**ATEL MARITIME INVESTORS, L.P.; ATEL MARITIME
INVESTORS, III, L.P.; KALAKANE, L.L.C., formerly known as Kala
Kane, L.L.C.,**

**Plaintiffs – Appellants**
**v.**

**SEA MAR MANAGEMENT, L.L.C.; NABORS WELL SERVICES
COMPANY; NABORS INDUSTRIES, LIMITED,**

**Defendants – Appellees**
-----------------------------------------------------------------
**On Appeal from the United States District Court
For the Eastern District of Louisiana**
-----------------------------------------------------------------

**CERTIFICATE OF INTERESTED PERSONS
REQUIRED BY LOCAL RULE 28.1**

The undersigned counsel of record certifies that the following listed persons
and entities as described in the fourth sentence of Rule 28.2.1 have an interest in
the outcome of this case. These representations are made in order that the judges
of this court may evaluate possible disqualification or recusal.

1.    ATEL Maritime Investors, L.P.;

2.    ATEL Maritime Investors, III, L.P.

3.    Kalakane, L.L.C., formerly known as Kala Kane, L.L.C.

4.    ATEL Capital Group

5.    Glenn G. Goodier, Christopher S. Mann, Matthew S. Lejeune of Jones Walker, LLP, 201 St. Charles Avenue, New Orleans, LA 70170, Counsel for Appellants, ATEL Maritime Investors, LP, ATEL Maritime Investors, III, LP, and Kalakane, LLC, formerly known as Kala Kane, L.L.C.;

6.    Sea Mar Management LLC;

7.    Nabors Well Services Co.;

8.    Nabors Industries, Limited;

9.    Thomas J. Smith, Amanda Elizabeth Kurz of Galloway, Johnson, Tompkins, Burr & Smith, One Shell Square – 40th Floor, 701 Poydras Street, New Orleans, LA 70130, Counsel for Appellees, Sea Mar Management LLC, Nabors Well Services Co.

This 30th day of January, 2014.

*/s/ Thomas J. Smith* _____

THOMAS J. SMITH (#17148)–Lead Counsel
AMANDA E. KURZ
Galloway, Johnson, Tompkins, Burr & Smith
1301 McKinney, Suite 1400
Houston, Texas 77010
(713) 599-0700
(713) 599-0777
Email:  tsmith@gjtbs.com
Email:  akurz@gjtbs.com

*Attorneys of Record for Appellees, Sea Mar Management, LLC and Nabors Well Services, Co.*

## STATEMENT REGARDING ORAL ARGUMENT

Because of the complexity of the issues, Appellees, Sea Mar Management LLC, and Nabors Well Services Co. request oral argument.

# TABLE OF CONTENTS

Certificate of Interested Persons Required by Local Rule 28.2.1 ...........................i

Statement Regarding Oral Argument Pursuant to Local Rule 28.2.4 ....................iv

Table of Contents ...............................................................................v

Table of Authorities ................................................................... viii

Jurisdictional Statement ......................................................................1

Statement of Issues Presented ................................................................2

Statement of the Case ........................................................................4

    A.    Background of the Parties ...............................................4

    B.    Negotiation of the MBCA ..............................................5

    C.    Terms of the MBCA .....................................................7

    D.    The Proposed Amendment .............................................8

    E.    Marketing the Atel vessels ............................................10

    F.    Marketing of the Atel vessels After SMM .........................12

    G.    Atel's Own Actions Speak Louder than Its Words ............13

Summary of the Argument ...................................................................15

Standard of Review ...........................................................................16

Argument ......................................................................................17

    I.    NWS and SMM were not a Single Business Enterprise ...................17

    II.    The District Court Correctly Determined that NWS has No Liability ..
        ....................................................................28

        A.    NWS did not Commit Fraud or Intentional Misrepresentation
            ....................................................................28

1.      NWS did not have a duty to disclose to Atel or SMM the charter hire rates it received from the subcharter of the Atel vessels. ................................................................29

2.      The Court correctly concluded that NWS lacked the requisite intent to commit fraud and/or intentional misrepresentation as NWS relied on Good Faith on Advice of Counsel when NWS subchartered the Atel vessels at charter hire rates that were higher than those NWS paid to SMM ........................................................30

B.      The District Court properly determined that NWS was not liable to Atel for conversion. .................................................34

III.    The Trial Court correctly determined that SMM has no liability ......35

A.      The District Court was correct in its factual findings with respect to the MBCA and its interpretation of the MBCA in light of those findings. ...........................................................35

1.      The District Court Correctly determined that Subchartering was allowed under the MBCA ...............36

2.      The District Court Correctly determined that SMM complied with the terms of the MBCA when it chartered the Atel vessels to NWS through the MTCA ................43

3.      The District Court correctly determined that the SMM exercised Commercially Reasonable Efforts to Market the Atel Vessels.     ........................................................46

4.      The District Court Correctly determined that NWS' Marketing of the Atel Vessels was an "Other Service" permitted under Article 13 of the MBCA ......................50

5.      Atel failed to Prove that it suffered damages as a result of SMM's alleged breaches of the MBCA ........................53

B.    The District Court was correct in its ruling that SMM did not make any false representations or deceptive non-disclosures to the detriment of Atel with respect to the method of marketing Atel's vessels...........................................................................55

C.    The District Court's judgment that SMM was not liable for negligent misrepresentation was correct....................................58

Conclusion .............................................................................................60

Certificate of Service ..............................................................................61

Certificate of Compliance with Rule 32(a) ............................................62

# TABLE OF AUTHORITIES

## CASES

*Andrew Martin Marine Corp. v. Stork-Werkspoor Diesel B.V.*, 480 F. Supp. 1270 (E.D. La. 1979). ............................................................................18, 19

*Bordagain Shipping Co. v. Saudi-Arabian Lines S.A.*, 1979 A.M.C. 1058 (E.D. La. 1978) affirmed per curiam 623 F.2d 710 (5th Cir. 1980). .....................................18

*Green v. Champion Ins. Co.*, 577 So. 2d 249, 257. .................................................17

*Hollowell v. Orleans Regional Hosp., LLC*, 217 F.3d 379, 385 (5th Cir. 2000). ...17

*Industrias Magromer Cueros y Pieles S.A. v. Louisiana Bayou Furs Inc.* 293 F.3d 912, 920 (5th Cir. 2002) decision clarified on denial of reh'g, 310 F.3d 786 (5th Cir. 2002). ............................................................................18

*In re Luhr Bros, Inc.*, 325 F.3d 681, 685 (5th Cir. 2003). .....................................16

*Markow v. Alcock*, 356 F.2d 194 (5th Cir. 1996). .................................................18

*Occidental of Umm al Qaywayn, Inc. v. A Certain Cargo of Petroleum Aboard the Tanker Dauntless Coloctronis*, 577 F.2d 1196, 1202 (5th Cir. 1978). ..................35

*Oracle 1031 Exch., LLC v. Bourque*, 2011-1133 (La. App. 3 Cir. 2/8/12); 85 So. 3d 736, 740. ............................................................................17

*Ramirez v. Dretke,* 396 F.3d 646, 649 (5th Cir. 2005). .........................................17

*Stolt Achievement, Ltd. v. Dredge B.E. Lindholm*, 447 F.3d 360, 363 (5th Cir. 2006). ............................................................................16

*Swift and Company Packers v. Compania Columbiana Del Caribe S.A.,* 339 U.S. 684 (1950). ............................................................................17

*Talen's Landing Inc. v. M/V Venture*, 656 F.2d 1157 (5th Cir. 1981). ..................18

*The Ely*, 110 Fed. 563, 570 (S.D. N.Y. 1901, affirmed 127 F. 447 (2d Cir. 1903), cert denied 189 U.S. 514 (1903)). ............................................................................37

*Tokio Marine & Fire Ins. Co., Ltd. v. FLORA MV*, 235 F.3d 963, 966 (5th Cir. 2001). ..............................................................................................................17

*United States v. Carr,* 740 F.2d 339, 346 n. 11 (5th Cir.1984). ............................31

*United States v. Impastato*, 2007 WL 2463310 (E.D. La. Aug. 28, 2007). ............31

*United States v. Peterson,* 101 F.3d 375, 381 (5th Cir.1996). ...............................31

## STATUTES & RULES

Benedict's on Admiralty § 186 (7th Ed. 2008). ......................................................37

**<u>JURISDICTIONAL STATEMENT</u>**

Appellees, Sea Mar Management LLC and Nabors Well Services Co., adopt the jurisdictional statement of appellants, ATEL Maritime Investors, L.P, ATEL Maritime Investors, III, L.P., and Kalakane, L.L.C., formerly known as Kala Kane, L.L.C (collectively, "Atel").

## STATEMENT OF THE ISSUES PRESENTED

1.    Did the Court correctly determine that NWS and SMM were Not a Single Business Enterprise?

2.    Did the District Court correctly determine that NWS has no liability?

2(A)  Did the District Court correctly determine that NWS did not commit fraud or intentional misrepresentation?

2(A)(1)    Did the District Court correctly determine that NWS did not have a duty to disclose to Atel or SMM the charter hire rates it received from the subcharter of the Atel vessels?

2(A)(2)    Did the District Court correctly determine that NWS lacked the requisite intent needed to commit fraud and/or intentional misrepresentation?

2(B)  Did the District Court correctly determine that NWS was not liable to Atel for conversion?

3.    Did the District Court correctly determine that SMM is not liable to Atel?

3(A)  Did the District Court correctly determine and apply its factual findings to the proper interpretation of the MBCA?

3(A)(1)     Did the District Court, both in its summary judgment ruling and Judgment and Reasons, properly determine that the MBCA allowed subchartering?

3(A)(2)     Did the District Court correctly determine that SMM complied with the MBCA when it chartered the Atel vessels to NWS?

3(A)(3)     Did the District Court correctly determine that SMM exercised commercially reasonable efforts to market the Atel Vessels?

3(A)(4)     Did the District Court correctly determine that NWS' marketing of the Atel vessels was an "Other Service" permitted under the MBCA?

3(A)(5)     Did the District Court correctly determine that Atel failed to present sufficient evidence that it suffered damages as a result of SMM's alleged breaches of the MBCA?

3(B)   Did the District Court correctly determine that SMM did not make any false representations or deceptive non-disclosure to Atel with respect to the method of marketing the Atel vessels?

3(C)   Did the District Court correctly determine that SMM was not liable to Atel for negligent misrepresentation?

3

## STATEMENT OF THE CASE

**A.    Background of the Parties**

The only defendants in the case below against whom Appellants are seeking relief in this Court are Sea Mar Management LLC ("SMM") and Nabors Well Services Co. ("NWS").[1]  The relevant history of those entities is discussed below.

In 1999, Nabors Holding Company purchased Pool Energy Services, the ultimate parent company of Pool Well Services.[2]  Sea Mar, Inc. was a company that owned and managed vessels.[3]  Sea Mar, Inc. was another wholly-owned subsidiary of Pool Well Services.[4]  Because of provisions of the Jones Act that prevented foreign-owned and operated vessels from conducting United States coastwise trade, Nabors US Finance acquired the Sea Mar, Inc. vessels and Sea Mar Investco ("SMI") was created as a U.S. holding company for SMM; SMM would operate the vessels.[5]

SMI was formed before various Nabors entities merged and underwent an inversion such that the parent entity of the Nabors entities changed from a United States entity to a Bermuda corporation known as "Nabors Industries Ltd." ("NIL"). In order to remain compliant with U.S. law, Sea Mar Investco LLC ("SMI") was

---

[1] *See* Atel's Appellate Brief.
[2] Doerre T. Tr., ROA.11994-11995.
[3] Plaisance T. Tr., ROA.11521, Doerre T. Tr., ROA.11995
[4] Doerre T. Tr., ROA.11995.
[5] Doerre T. Tr., ROA.11996.

formed.[6]  Michael Jesselson, Judy Kelly, and Michael Jesselson's trust owned 75% of SMI and Nabors Diamond Holdings (not a party to this action) owned the other 25%.[7]  SMI's business activities were conducted through a Board of Managers, which consisted of Jesselson, Ms. Kelly and DeWitt (as Nabors Diamond Holdings representative.)[8]  SMI was the sole member of SMM.[9]  The day-to-day activities of SMM were conducted by SMM employees and managers, Darrell Plaisance and John Powell.[10]  Beginning in June 2002, NWS began marketing vessels that were operated by SMM.[11]  Pool Well Services eventually changed its name to Nabors Well Services Co. ("NWS").[12]  Van DeWitt became President of Sea Mar Division of NWS, which is not a legal entity separate from NWS.[13]  DeWitt was not on the board of NWS.

## B.    Negotiation of the MBCA

SMM and Atel spent several months negotiating the terms of the Master Bareboat Charter Agreements ("MBCA") before finally executing the two MBCA.[14]  As the parties are in agreement that the relevant terms of the two

---

[6] Doerre T. Tr., ROA.11987-11988.
[7] Doerre T. Tr., ROA. 11989-11990.
[8] Doerre T. Tr., ROA. 11992 and 12008.
[9] ROA.10583
[10] DeWitt T. Tr., ROA.11942.  ROA.10594
[11] Plaisance T. Tr., ROA.11540.  Powell T. Tr., 12325- 12326
[12] Plaisance T. Tr., ROA.11524.
[13] Doerre T. Tr., ROA.11992-11995, 11999.  DeWitt T. Tr., ROA.11937.
[14] Plaisance T. Tr., ROA.11545, 11558-11559, 11647. Morais T. Tr., ROA.12156-12157.

MBCAs are identical, both will collectively be referred to in the singular and as "MBCA."

In the months of the negotiations, Atel neither determined how SMM marketed the other vessels that SMM managed nor discussed the issue of subchartering.[15]    Tom Monroe, Atel's representative, visited SMM one time in New Iberia, Louisiana where he spent a "few days" observing the operations.[16] While at SMM, Monroe did not request to view any contracts that SMM had with any of its customers or inquire as to the method by which SMM marketed the vessels SMM operated.[17]    In fact, Monroe simply concluded that SMM had a marketing function based on the fact that Plaisance seemed to be friendly with individuals that Monroe felt were decision makers.[18]    Additionally, Vasco Morais as counsel for Atel negotiated the terms of the MBCA for three to four months and also did not personally investigate or inquire into the method by which SMM marketed the vessels it operated.[19]

Prior to operating and securing time charters for the Atel vessels, SMM operated and secured time charters for vessels owned by Nabors' entities.[20]    SMM

---

[15] Plaisance T. Tr., ROA.11648. Monroe T. Tr., ROA.11752.
[16] Monroe T. Tr., ROA.11751-11752.
[17] Monroe T. Tr., ROA.11752.
[18] Monroe T. Tr., ROA.11752-11753
[19] Morais T. Tr., ROA.12158.
[20] Plaisance T. Tr., ROA.11523

provided crew, maintenance, storage, and repair for the vessels.[21]  Before entering into the MBCA for the Atel vessels, SMM had exclusively utilized the services of NWS to market the vessels being operated by SMM.[22]  NWS had a number of Master Time Charter Agreements with third party oil and gas companies and other entities that utilized vessel services in the Gulf of Mexico.[23]  SMM was aware that it could market the vessels through NWS at the time it negotiated and entered the MBCA.[24]

## C.     Terms of the MBCA

On July 7, 2004, Atel entered into the MBCA with SMM.[25]  The only parties to the MBCA were Atel and SMM.[26]  The MBCA was a valid and binding contract.[27]  The MBCA is clear and unambiguous.[28]  The MBCA was a demise charter and specifically provided that SMM was owner *pro hac vice* of the Atel vessels.[29]  There was no express prohibition in the MBCA against SMM subchartering the Atel vessels.

---

[21] ROA.10590.
[22] T. Tr., Monroe ROA.11641.
[23] ROA.10590.
[24] Plaisance T. Tr., ROA.11548
[25] ROA.10579.
[26] ROA.10579.
[27] ROA.10579.
[28] *See* Appellant's Brief.
[29] Exhibit D-2, MBCA.

As Atel has acknowledged, it was at all times contemplated that SMM would subcharter the Atel vessels.[30]  To that end, Atel and SMM had agreed that there were certain entities to whom SMM could time charter the Atel vessels without prior approval of Atel.[31]  These entities were set forth in Schedule II of the MBCA.[32]  Included in that agreed list was Sea Mar Division of Pool Well Services (later renamed "Sea Mar Division of Nabors Well Services Co."), an entity to whom SMM could charter the Atel vessels without Atel's approval.[33]  This was a negotiated provision of the MBCA.  Notably, the MBCA also specifically provided that SMM did not warrant any utilization rate or particular charter hire rate for the Atel vessels.

## D.     The Proposed Amendment

DeWitt, President of Sea Mar Division of NWS, was instructed to either negotiate an amendment to the MBCA that would expressly authorize NWS to subcharter the Atel vessels at a higher rate than that being paid to Atel, or terminate the MBCA.[34]  DeWitt was later advised by James Lank, legal counsel with Nabors Corporate Services which provides legal services to Nabors entities, that NWS could subcharter the Atel vessels at rate higher than that it paid to SMM

---

[30] *See* Appellants' Brief.
[31] ROA.10590.
[32] ROA.10590.
[33] Exhibit D-2, MBCA.
[34] Lank T. Tr., ROA.12391,12393-12394, 12424. *See also* Exhibit P-12, December 14, 2004 Memo from SMM Board of Directors, Appellants' Record Excerpt 10.

to charter the vessels from SMM without the need for an amendment to the MBCA.[35]

Prior to Lank's advices to that effect, Lank had drafted a proposed amendment.[36] The proposed amendment stated that SMM's obligation to obtain time charters would be fulfilled by entering into a Master Time Charter Agreement ("MTCA") with NWS, "which may further subcharter the Vessels to other customers at rates set in its [NWS'] sole discretion."[37] Lank provided the proposed amendment that he drafted to DeWitt who sent it to Plaisance who then provided the amendment to Atel.[38] Vasco Morais, in-house counsel for Atel, reviewed the proposed amendment and made comments to the amendment.[39] Although Morais clearly expressed his objection to other proposed provisions in the proposed amendment by writing "no" on the draft of the proposed amendment, Morais did not do so to the proposed provision regarding NWS' ability to charter the vessels at a rate set in its sole discretion.[40] In his comments, Morais indicated that Atel did

---

[35] Lank T. Tr., ROA.12426-12430, 12467-12468.
[36] Lank T. Tr., ROA.12393-12394, 12396.
[37] Exhibit D-6, MBCA Proposed Amendment.
[38] DeWitt T. Tr., ROA.11825.
[39] Morais T. Tr., ROA.12178-12182. Exhibit D-6, MBCA Proposed Amended with Morias' comments.
[40] Morais T. Tr., ROA.12178.

not have an objection to NWS subchartering the Atel vessels; rather he was concerned with the third party entities creditworthiness issues.[41]

When discussions regarding the proposed amendment stalled out, DeWitt re-visited with Lank to review the MBCA to determine whether the amendment was needed.[42]  Lank then reviewed the MBCA and reiterated that MBCA allowed NWS to subcharter the Atel vessels at rates set by NWS without an amendment to the MBCA.[43]

## E.     Marketing the Atel vessels

In fulfilling its obligation under the MBCA to use commercially reasonable efforts to time charter the Atel vessels, SMM entered into the MTCA with NWS on January 19, 2005.  Pursuant to the MTCA, NWS was permitted to subcharter the Atel vessels.  NWS solicited time charters with third party oil and gas companies with which NWS had Master Service Agreements or other similar pre-existing contractual arrangements.  SMM would enter a Short Form Time Charter with NWS in connection with the Atel vessel that was being subchartered by NWS to a third-party.  NWS would contact Plaisance with SMM and advise SMM that NWS could subcharter the vessels at a particular day rate.  Plaisance would then contact the Atel representative, Tom Monroe, and seek Atel's agreement to charter the

---

[41] Exhibit D-6, MBCA Proposed Amended with Morias' comments.  Lank T. Tr., ROA.12396-12397.
[42] Lank T. Tr., ROA.12398-12399.
[43] Lank T. Tr., ROA.12398-12399, 12426-12427.

Atel vessels at the proposed day rate. No Atel vessel was time chartered without Monroe's approval of the rate.

One of SMM's obligations under the MBCA was to account for all time charter hire and other amounts it earned and received.[44] SMM complied with this obligation. SMM would invoice NWS for the time and at the charter hire rates approved by Atel. SMM would issue the invoices to NWS on the 1st and 15th of each month or the end of the charter.[45] NWS would then pay the invoice issued by SMM by wiring the money directly to SMM's New Iberia lock box account.[46] SMM turned over all of the revenues that SMM received for the Atel vessels and provided Atel with documentation reflecting the revenues.[47]

In almost all of the subcharters there was a difference between the charter hire rate offered to SMM and the rate obtained by NWS. In each event Atel approved the charter hire rate received by SMM for the Atel vessels.[48] Neither Darrell Plaisance nor John Powell had knowledge of the difference in the charter hire rates between what was received by NWS and what was paid by Atel by NWS for each individual contract.[49]

---

[44] Exhibit D-2, MBCA.
[45] Powell T. Tr., ROA.12322. Auyeung T. Tr., ROA.12283. ROA.10592.
[46] Auyeung T. Tr., ROA.12300, 12321. ROA.10592.
[47] Powell T. Tr., ROA.12332.
[48] ROA.10591.
[49] Plaisance T. Tr., 11612-11613, 11689. Powell T. Tr., ROA.12323.

DeWitt served as the Nabors appointee on the Board of Managers of Sea Mar Investco LLC.[50]  As a factual matter, DeWitt did not disclose to Plaisance or Powell the difference in the charter hire rates on any of the subcharters by NWS of Atel vessels.[51]  DeWitt was aware of the difference in the charter hire rate in his capacity as President of Sea Mar Division of NWS.[52]  The information as to the rates being received by NWS was proprietary and of commercial value.[53]

During the time that SMM operated the Atel vessels, the Atel vessels were utilized almost 100% of the time.  Atel earned approximately $30,000,000.00 while SMM chartered the Atel vessels.[54] Monroe felt that SMM did a good job of marketing and utilizing the Atel vessels and was happy with the utilization of the Atel vessels during the relevant time period.[55]

## F.    Marketing of the Atel vessels After SMM

The MBCA were assigned to Hornbeck Offshore Services ("HOS") in August 2007 in connection with the sale of the vessels to HOS; subsequently, the operations and marketing of the Atel vessels was performed by HOS.[56]  While under HOS control, the vessels were stacked and not earning any money from

---

[50] Doerre T. Tr., ROA. 11992 and 12008.
[51] DeWitt T. Tr., ROA.11918-11919.  Plaisance T. Tr., 11612-11613, 11689.  Powell T. Tr., ROA.12323.
[52] ROA.10584-10585.
[53] Compeaux T. Tr., ROA.12246.
[54] ROA.10591.
[55] ROA.10591.
[56] Monroe T. Tr., ROA.11736-11737.

charters.[57]  Atel was not satisfied with the utilization of their vessels while at HOS so they moved the vessels to GulfMark.[58]  The Atel vessels were then managed by GulfMark, but were not given "100% attention"; Atel terminated their agreement with GulfMark.[59]  Atel then entered into an agreement with Bee Mar for Bee Mar to operate and charter the vessels.[60]  Interestingly, DeWitt and Plaisance, the individuals that Atel claims caused Atel to lose approximately three million dollars are officers of Bee Mar.

## G.    Atel's Own Actions Speak Louder than Its Words

Atel has spent much effort appearing indignant about the result of the deal it made that earned it approximately $30,000,000.00.[61]  The best evidence of Atel's true perspective is Atel's actions after learning of the "fraud" it had asserted was perpetrated by SMM and NWS.  Starting in March of 2009, Atel claimed that SMM had "fraudulently" and "intentionally" misrepresented the amounts SMM received for the charter hire of the Atel vessels.[62]  Then, beginning in September of 2009, Atel began making allegations of RICO violations and conversion against SMM and NWS.[63]

---

[57] ROA.10591.
[58] Monroe T. Tr., ROA.11739-11740 and 11766.  ROA.10591-10592.
[59] Monroe T. Tr., ROA.11766.  ROA.10592.
[60] Monroe T. Tr., ROA.11740.  ROA.10592.
[61] ROA.10591.
[62] ROA.607-618.
[63] ROA.789-798.

The evidence established that the person from SMM who contacted Atel and provided the supposedly misrepresented charter hire rates was Plaisance.[64] The actor for NWS who Atel claims misled Atel and "schemed" to implement the 10% "fraudulent retention scheme" was DeWitt.[65] The following evidence was also presented at trial: (1) in connection with the sale by Nabors of its vessel assets, Nabors assigned the MBCA with respect to the Atel vessels to Hosbeck, where Plaisance operated and managed the vessels[66]; (2) Atel subsequently moved the vessels to Gulfmark, where Plaisance again operated and managed the vessels;[67] (3) Atel then moved the vessels to Bee Mar, where Plaisance operated and managed the vessels[68]; (4) DeWitt is President and CEO of Bee Mar[69]; (5) at least one of the Atel vessels has been managed and operated by Bee Mar since 2009 and continued to be so operated at least through the trial of this matter[70]; and (7) the General Counsel of Atel does not recall how Atel changed the agreements with Gulfmark and Bee Mar to reflect that the companies cannot subcharter the vessels at a higher rate than disclosed and paid to Atel[71]. Atel obviously does not believe that Plaisance or DeWitt performed any intentional or wrongful acts or they would

---

[64] *See* Appellants' brief.
[65] *See* Appellants' brief.
[66] Plaisance T. Tr., ROA.11624, 11628.
[67] Plaisance T. Tr., ROA.11629.
[68] Plaisance T. Tr., ROA.11630-11632. Monroe T. Tr., ROA.11740, 11763.
[69] Plaisance T. Tr., ROA.11630-11632. Monroe T. Tr., ROA.11740, 11763.
[70] Plaisance T. Tr., ROA.11630-11632. Monroe T. Tr., ROA.11740, 11763.
[71] Morais T. Tr., ROA.12215.

not have continued to place their $2,000,000.00 per vessel assets with Plaisance and/or DeWitt.  It was particularly notable that Morais could only say that having Plaisance and DeWitt continue to manage and operate was a source of "controversy" within Atel, a controversy that was still not resolved over three years after the alleged fraud was disclosed.[72]

## SUMMARY OF THE ARGUMENT

After considering all of the evidence presented at trial, the District Court's decision that Atel did not meet its heavy burden to show that SMM and NWS were a single business enterprise was plausible in light of the evidence in the record, not clearly erroneous, and should be affirmed.

Additionally, the District Court correctly determined that NWS has no liability.  NWS did not commit fraud or intentional misrepresentation as NWS did not have a duty to disclose the charter hire rate it received when it subchartered the Atel vessels.  Further, even assuming that NWS had a duty to disclose the information, the District Court's decision that NWS lacked the requisite intent to commit fraud based on NWS' good faith reliance on advice of counsel was correct and should be affirmed.  Lastly, the District Court properly determined that NWS was not liable to Atel for conversion as Atel was not entitled to possession of the money NWS received for subchartering the Atel vessels.

---

[72] Morais T. Tr., ROA.12218-12219.

The District Court also correctly interpreted the MBCA when it determined that: (1) subchartering was allowed under the MBCA; (2) SMM complied with the MBCA's terms when it chartered the Atel vessels to NWS through the MTCA; (3) SMM exercised commercially reasonable efforts to market the Atel vessels; (4) NWS' marketing of the Atel vessels was an "other service" under the MBCA; and (5) Atel did not present evidence that it suffered damages as a result of the alleged breaches of the MBCA. The District Court was also correct when it held that SMM did not make any false representations or non-disclosures to the detriment of Atel with respect to the method of marketing the Atel vessels. Lastly, the District Court's properly determined that SMM was not liable to Atel for negligent misrepresentation.

## STANDARD OF REVIEW

"Highly deferential review is afforded to bench trials of admiralty actions."[73] "In an admiralty action following a bench trial, the factual findings are binding unless clearly erroneous."[74] If the district court's account of the evidence is plausible in light of the record, the Appellate Court may not reverse, even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.[75]

---

[73] *In re Luhr Bros, Inc.*, 325 F.3d 681, 685 (5th Cir. 2003).
[74] *Stolt Achievement, Ltd. v. Dredge B.E. Lindholm*, 447 F.3d 360, 363 (5th Cir. 2006).
[75] *Id.*

A District Court's conclusions of law are reviewed *de novo*.[76]  When a Court examines mixed questions of law and fact, the Court employs "a de novo standard by independently applying the law to the facts found by the district court, as long as the district court's factual determinations are not clearly erroneous."[77]

## ARGUMENT

## I.     NWS AND SMM WERE NOT A SINGLE BUSINESS ENTERPRISE

The District Court's holding that SMM and NWS did not constitute a single business enterprise is a finding of fact and will only be disrupted if the finding constituted manifest error.[78]  "The question of whether to pierce the corporate veil is primarily one of fact and therefore a very deferential standard of review applies."[79]  As set forth below, there was no manifest error in the Judgment of the District Court on this issue.

ATEL's claims in this matter are governed by maritime law; the Louisiana law concept of single business enterprise does not apply.  A federal court, sitting in admiralty jurisdiction has the power to pierce the corporate veil of the defendants corporation.[80]  The facts in each particular case determine whether the corporate veil should be pierced.  Case law has developed general rules regarding when a

---

[76] *Tokio Marine & Fire Ins. Co., Ltd. v. FLORA MV*, 235 F.3d 963, 966 (5th Cir. 2001).

[77] *Ramirez v. Dretke,* 396 F.3d 646, 649 (5th Cir. 2005).

[78] *Oracle 1031 Exch., LLC v. Bourque*, 2011-1133 (La. App. 3 Cir. 2/8/12); 85 So. 3d 736, 740; *see also Green v. Champion Ins. Co.*, 577 So. 2d 249, 257.

[79] *Hollowell v. Orleans Regional Hosp., LLC*, 217 F.3d 379, 385 (5th Cir. 2000).

[80] *Swift and Company Packers v. Compania Columbiana Del Caribe S.A.*, 339 U.S. 684 (1950).

court should exercise its power in that regard and each case must be judged within its own context.[81]    Although a court may find the law of a particular state persuasive, the law to be applied is common law.[82]    A court may disregard the corporate entity when it appears that the corporation was organized for fraudulent or illegal purposes.[83]    A court may also pierce the corporate veil when it will prevent manifest injustice to third parties.[84]    However, the party seeking to the pierce the corporate veil bears the heavy burden of proof.[85]

"A trial court should pierce the corporate veil and require a parent corporation to answer for the debts of the subsidiary when the subsidiary conducts business in a manner that clearly indicates that the parent is the alter ego of the subsidiary."[86]    Historically, courts have considered several factors to determine if one corporation is the alter ego of another.    In evaluating the totality of circumstances, courts usually consider the following factors: (1) common stock ownership; (2) common directors or officers; (3) financing of the subsidiary by the parent; (4) the incorporation of the subsidiary being caused by the parent; (5) grossly inadequate capital for the subsidiary; (6) payment of the salaries of the

---

[81] *Bordagain Shipping Co. v. Saudi-Arabian Lines S.A.*, 1979 A.M.C. 1058 (E.D. La. 1978) affirmed per curiam 623 F.2d 710 (5th Cir. 1980).

[82] *See Talen's Landing Inc. v. M/V Venture*, 656 F.2d 1157 (5th Cir. 1981).

[83] *Andrew Martin Marine Corp. v. Stork-Werkspoor Diesel B.V.*, 480 F. Supp. 1270 (E.D. La. 1979).

[84] *Id*.

[85] *Industrias Magromer Cueros y Pieles S.A. v. Louisiana Bayou Furs Inc.* 293 F.3d 912, 920 (5th Cri. 2002) decision clarified on denial of reh'g, 310 F.3d 786 (5th Cir. 2002).

[86] *Markow v. Alcock*, 356 F.2d 194 (5th Cir. 1996).

subsidiary; (7) the subsidiary receiving no business except that given to it by the parent; (8) the parent using the subsidiary's property as its own; (8) whether formal legal requirements were observed; (9) whether formal requirements were observed; (10) whether the directors of one corporation acted in the independent and primary interest of the other; (11) whether the two operations were so integrated through the commingling of funds, interactivities and common direction and supervision that they should be considered one enterprise; and (12) whether one corporation is so organized and controlled and its business conducted in such a manner as to make it merely an agency, instrumentality, adjunct, or alter ego of another.[87]

Despite ATEL's contention, after hearing the evidence at trial and considering the credibility of the witnesses, the District Court held that SMM and NWS did not constitute a single business enterprise as: (1) Sea Mar Investco was created in order to comply with the Jones Act requirements with respect to entities engaged in coast-wide trade, and the corporate structure was approved by the Coast Guard "with the understanding and recognition that each entity was distinct and would operate separately;"[88] (2) Ms. Doerre's testimony and Nabors' organizational chart demonstrated the "separate functions and operations of NIL,

---

[87] *Andrew Martin Marine Corp. v. Stork-Werkspoor Diesel B.V.*, 480 F. Supp. 1270 (E.D. La. 1979).
[88] ROA.11073; Doerre T. Tr., ROA.12048.

NWS, and SMM;"[89] (3) "there were no common board members among SMI, NWS or NIL;"[90] (4) "each entity maintained its own books, balance sheets and income statements" and "revenue earned by each company is deposited in the company's bank account and reflected on its balance sheet;"[91] (5) Ms. Doerre's testified that each defendant was a separate entity and observed corporate formalities;[92] and (6) Powell testified that the salaries of SMM employees were paid by SMM.[93]  In addition to these specific findings, the District Court also noted that ATEL failed to carry its burden on **many** of the other relevant factors (emphasis added).

Additionally, the Court noted that its factual findings were "not an exhaustive list of all of the evidence presented at trial to refute ATEL's contention that Defendants were a single business enterprise or are alter egos of another. However, the Court has contemplated all of the evidence and testimony presented at trial, and finds that, when considered in its totality, the evidence demonstrates that each defendant was a separate entity."[94]

After reviewing <u>all</u> of the evidence presented at trial, the District Court concluded that NWS and SMM did not engage in a single business enterprise and

---

[89] ROA.11073; Doerre T. Tr., ROA.12048.
[90] ROA.11074; Doerre T. Tr., ROA.11998.
[91] ROA.11074; Doerre T. Tr., ROA.12021-12023.
[92] ROA.11074; Doerre T. Tr., ROA.11980, 11986-11987, 11990, 12000-12001.
[93] ROA.11074; Powell T. Tr., ROA.12338
[94] ROA.11076.

ATEL did not meet its burden to establish a single business enterprise.[95]  Contrary to ATEL's argument, the undisputed and overwhelming evidence at trial showed that during the relevant time periods, SMM and NWS did not constitute a single business enterprise.

The District Court's findings on this issue were supported by the evidence. Initially, there was a legitimate reason for, and actual functioning as, distinct and separate entities by NWS and SMM.  In 1999, Nabors Holding Company (then a U.S. entity) purchased Pool Energy Services, the ultimate parent company of Pool Well Services.[96]  Sea Mar, Inc. was a company that owned and managed vessels.[97] Sea Mar, Inc. was a wholly-owned subsidiary of Pool Well Services.[98]  Various Nabors entities subsequently underwent mergers and an inversion, and the ultimate parent entity was a Bermuda corporation.  Because the Jones Act prohibited a non-United States citizen (or entity at least 75% owned by U.S. citizens) from operating vessels, although they could own them, Nabors US Finance acquired the Sea Mar vessels and Sea Mar Investco was created as a U.S. holding company for Sea Mar Management, which would operate the vessels.[99]  Pool Well Services eventually changed its name to Nabors Well Services Co.[100]  DeWitt became President of Sea

---

[95] ROA.11069-11079.
[96] Doerre T. Tr., ROA.11994-11995.
[97] Plaisance T. Tr., ROA.11521.
[98] Doerre T. Tr., ROA.11995.
[99] Doerre T. Tr., ROA.11996.
[100] Plaisance T. Tr., ROA.11524.

Mar Division of NWS, which is not a legal entity separate from NWS.[101]
Beginning in June 2002, NWS began marketing the vessels that were operated by
SMM.[102]

Additionally, the corporate structures and boards of SMM and NWS were
separate and distinct. Before NIL became a Bermuda entity, SMI was formed.[103]
Michael Jesselson, Judy Kelly, and Michael Jesselson's trust owned 75% of SMI
and Nabors Diamond Holdings (also not a party to this action) owned the other
25%.[104] SMI's business activities were conducted through a Board of Managers,
which consisted of Jesselson, Ms. Kelly and DeWitt (as Nabors Diamond Holdings
representative.)[105] SMI was the sole member of SMM.[106]

SMM was organized under the laws of Delaware.[107] The officers and
managers of SMM were Michael Jesselson, John Powell, and Darrel Plaisance.[108]
Plaisance was operations manager for SMM and Powell was head of accounting.[109]
Plaisance and Powell were involved in day-to-day operations.[110]

---

[101] Doerre T. Tr., ROA.11992-11995, 11999. DeWitt T. Tr., ROA.11937.
[102] Plaisance T. Tr., ROA.11540. Powell T. Tr., ROA.12325.
[103] Doerre T. Tr., ROA.11988.
[104] Doerre T. Tr., ROA. 11989-11990.
[105] Doerre T. Tr., ROA. 11992 and 12008.
[106] Doerre T. Tr., ROA.11989-11990.
[107] Doerre T. Tr., ROA.11990.
[108] DeWitt T. Tr., ROA.11942.
[109] Plaisance T. Tr., ROA.11521. Powell T. Tr., 12309.
[110] DeWitt T. Tr., ROA.11942. ROA.10594.

Similarly, there was a separate payroll and accounting for funds generated by NWS and SMM. Nabors Corporate Services ("NCS") (not a party to this action) is a Delaware corporation with a principal place of business in Houston, Texas.[111] NCS provides corporate services to the Nabors' related companies.[112] These services include legal services, accounting services, treasury services, risk management/insurance services, and payroll services.[113] As part of its payroll service, NCS acts as a payroll outsource company, similar to a company such as ADT, and processes payroll in accordance with the instructions of the various business entities. For example, employees of Nabors Drilling USA receive a check that states "Nabors Corporate Services, Inc. as paying agent for Nabors Drilling USA."[114] Although NCS provides the service, the money paid to the Nabors' employees is obtained from the actual employer;[115] the salaries of the SMM employees were paid by SMM.[116] In addition to payroll services, NCS provides legal services to the various Nabors' entities, essentially acting as an outside law firm.[117]

---

[111] Doerre T. Tr., ROA.12000.
[112] Doerre T. Tr., ROA.12001.
[113] Doerre T. Tr., ROA.12001.
[114] Doerre T. Tr., ROA.12001.
[115] Doerre T. Tr., ROA.12002.
[116] Powell T. Tr., ROA.12338-12339
[117] Doerre T. Tr., ROA.12007.

NCS also provides accounting services to the various Nabors' entities.[118] Although the money from the various entities are generated by that entity and accounted for and maintained for that entity, NCS sweeps the accounts and manages the money for the benefit of the entity.[119]  However, the generating entity still owns the cash.  This accounting is reflected on the income and expenses for the particular entity's income statement.[120]

Further, despite Appellant's claim, SMM did not have grossly inadequate capital.  Ms. Doerre testified at trial that SMM's operating agreement was merely a recital of the capitalization.[121]  In fact, Ms. Doerre also testified that in exchange for their 75% ownership in SMI, the Jesselson interests paid Nabors Diamond Holdings approximately $1,000,000.00.[122]  Similarly, SMM was formed in the same way and was provided the capital it needed to operate the company.[123]

Likewise, the formation of SMM was not caused by NWS or NIL.  The Jesselson Trust, Michael Jesselson, and Judith Kelly own 75% of the SMI.[124] Nabors Diamond Holdings, Inc. owned the other 25% of SMI.[125]

---

[118] Doerre T. Tr., ROA.12021.
[119] Doerre T. Tr., ROA.12022.
[120] Doerre T. Tr., ROA.12022-12023.
[121] Doerre T. Tr., ROA.12020-12021.
[122] Doerre T. Tr., ROA.12019-12020.
[123] Doerre T. Tr., ROA.12020-12021.
[124] Doerre T. Tr., ROA.11989-11990.
[125] Doerre T. Tr., ROA.11989-11990.

SMM and NWS also were not organized and controlled nor was their business conducted in such a manner as to make them merely an agency, instrumentality, adjunct, or alter ego of another. Each Defendant was a separate entity and observed the proper corporate formalities.[126]  As stated throughout, Jesselson as 75% owner of SMI, not Nabors, had the controlling interest in SMI.[127] In fact, SMM did not enter into the MBCA without Jesselson's approval as he owned the majority of the company.  Additionally, Powell and Plaisance of SMM controlled the day-to-day activities of SMM, not anyone from Nabors.[128]

Like any other for-profit business entity, SMM provided services in exchange for revenue.  Every service or charter entered between NWS and SMM was backed up by charter agreements, contracts, and invoices reflecting the agreements.[129]  SMM was not solely financed by NWS.  To the contrary, Atel and NWS functioned very similarly in their arrangement with SMM.  SMM did not receive all of tis income from NWS.  Both NWS and Atel paid SMM a management fee for the vessels that SMM managed and reimbursed SMM for any expenses over the operating budget.[130]

---

[126] Doerre T. Tr., ROA.11980 (NIL observed proper corporate formalities); 11990 (SMI observed proper corporate formalities); 12000 (NCS observed proper corporate formalities).
[127] Doerre T. Tr., ROA.11989-11990.
[128] ROA.10594.  Plaisance T. Tr., 11671-11672.
[129] DeWitt T. Tr., ROA.11954-11955, 11808-11809.
[130] Powell T. Tr., ROA.12315, 12322-12323.

In addition to marketing vessels, NWS was also in the business of well servicing, fluid hauling, and working over oil wells; the majority of NWS' revenue was generated by such services.[131]  In fact, NWS is operating today without the revenue generated by marketing the vessels that SMM operated.[132]

No directors of SMM acted in the independent and primary interest of NWS. As stated above, Jesselson was a 75% owner of SMI, the sole member of SMM. As controlling owner, Jesselson would not have entered into an arrangement that did not benefit SMM as he did not receive any profit from NWS.  DeWitt as an officer of NWS had a duty to maintain confidential information, which included the rates that NWS received for chartering the Atel vessels.[133]

SMM and NWS' operations were not integrated through the commingling of funds, interactivities and common direction and supervision that they should be considered one enterprise.  During the relevant time periods, there was no failure to provide separate bank accounts and bookkeeping records by SMM or NWS. Auyeung received invoices from SMM for the services that NWS performed on the vessels owned by Nabors U.S. Finance.[134]  He would then remit payment to SMM for the services rendered.  Powell issued invoices to NWS for SMM's charter to NWS and prepared and issued invoices to Atel for the expenses that Atel was to

---

[131] Auyeung T. Tr., ROA.12295-12296.
[132] ROA.10586.
[133] DeWitt T. Tr., ROA.11918-11920.
[134] Auyeung T. Tr., ROA.12297.

reimburse SMM.[135]   SMM and NWS had separate bank accounts and any transactions between the two corporations were heavily documented to ensure that all corporate formalities were observed.[136]

Interestingly, ATEL alleged that NWS and SMM are a single business for many reasons, including the fact that both NWS and SMM are indirectly and/or directly owned by NIL and allegedly have common directors or officers. However, Atel is structured in a manner similar to Nabors.   Atel Maritime Investors are the entities that entered into the MBCA.[137]   According to Morais, Atel Maritime Investors are titling entities, similar to a trust.[138]   Atel Financial Services is the primary operating entity and manager of the public offerings for Atel.[139]  Morais is employed as general counsel of Atel Capital Group.[140]  Morais is an officer of both Atel Financial and Atel Maritime.[141]   Morais provided legal services to Atel Maritime on behalf of Atel Finance.[142]  Morais agreed that his role in negotiating and executing the MBCA as legal counsel for Atel Financial did not mean that Atel Financial and Atel Maritime were the same entity.[143]

---

[135] Powell T. Tr., ROA.12305 and 12322.
[136] Powell T. Tr., ROA.12338-12339. Doerre T. Tr., ROA.11990.
[137] Exhibit D-2, MBCA.
[138] Morais T. Tr., ROA.12140.
[139] Morais T. Tr., ROA.12119-12120.
[140] Morais T. Tr., ROA.12119-12120 and 12142.
[141] Morais T. Tr., ROA.12142
[142] Morais T. Tr., ROA.12140-12141.
[143] Morais T. Tr., ROA.12141-12142

Contrary to Atel's allegations, the evidence established at trial that NWS was owned by Nabors Diamond Holdings, Inc.[144]  Nabors Diamond Holdings, Inc. owned 25% of Sea Mar Investco, the entity that wholly owned SMM.[145]  There is no evidence that SMM and NWS constitute a single business enterprise.  SMM and NWS were separate and distinct entities.[146]  SMM's offices were in New Iberia, Louisiana.[147]  NWS' office is located in Houston, Texas.[148]  Both SMM and NWS had their own employees and payroll.  For the foregoing reasons, the District Court's decision should Atel did not meet its heavy burden to show that SMM and NWS were a single business enterprise was plausible in light of the evidence in the record, not clearly erroneous, and should be affirmed.

## II.   THE DISTRICT COURT CORRECTLY DETERMINED THAT NWS HAS NO LIABILITY

### A.   NWS DID NOT COMMIT FRAUD OR INTENTIONAL MISREPRESENTATION

Essentially, Atel alleged that NWS is liable to Atel for fraud as NWS failed to disclose to Atel that NWS received approximately 10% higher rates for subchartering the Atel vessels to subcharterers than what NWS paid to SMM to time charter the vessels.  NWS located subcharterers to charter the vessels at a

---

[144] Doerre T. Tr., ROA.11997
[145] Doerre T. Tr., ROA.11989-11990.
[146] Powell T. Tr., ROA.12338.
[147] Doerre T. Tr., ROA.12024.
[148] ROA.10592.

charter hire rate that was not disclosed to SMM.[149]   The District Court determined that SMM and NWS are separate and distinct entities with separate offices and separate employees.[150]   At no time was there any contractual relationship between Atel and NWS.[151]   By entering into the MTCA with NWS and time chartering the vessels to NWS at a commercially reasonable rate that was approved by Atel, SMM engaged in commercially reasonable efforts to charter the Atel vessels to NWS.   NWS provided commercially valuable services, including bearing the risk of the creditworthiness of the subcharterers.[152]   NWS had no obligation to disclose to Atel or SMM the charter hire rate that it received from its subcharterers.[153]

### 1.   NWS DID NOT HAVE A DUTY TO DISCLOSE TO ATEL OR SMM THE CHARTER HIRE RATES IT RECEIVED FROM THE SUBCHARTER OF THE ATEL VESSELS

Atel asserted that NWS was required to disclose the difference in the charter hire charged to the third party subcharterers and the charter hire amount NWS paid to SMM.[154]   However, in both its brief to the District Court and its Appellate Brief, it failed to point to the duty and/or law to that effect.   Further, the facts of industry custom and usage rebut that claim.[155]   At trial, SMM and NWS tendered, and the Trial Court accepted Mark Compeaux as an expert in the areas of vessel marketing

---

[149] ROA.10587.
[150] ROA. See also *supra* for discussion of the separateness of SMM and NWS.
[151] Auyeung T. Tr., ROA.12299. ROA.10587.
[152] DeWitt T. Tr., ROA.11918-11919.
[153] Compeaux T. Tr., ROA.12246.
[154] *See* Appellants' Brief.
[155] Lank T. Tr., ROA.12469-12470.  Compeaux T. Tr., ROA.12246.

of offshore vessels in the Gulf of Mexico and the commercial or marketing environment in the Gulf of Mexico.[156] NWS' situation was analogous to that of C&G Boats, Compeaux's employer. When C&G obtains a job, a representative of C&G asks the vessel owner if the vessel owner will accept a certain rate.[157] If the owner accepts that rate, C&G then adds a fee and offers the rate plus the fee to the customer.[158] At no point does C&G disclose the actual rate it charges to the vessel owner.[159] As long as the vessel owner agreed to the rate that it received from C&G, C&G fulfilled its obligation to the vessel owner.[160] This is industry practice.[161] In fact, the rate that is charge to the customers is commercially valuable information.[162] Both at trial and in its brief, Atel failed to provide any evidence to dispute Compeaux's testimony. Without a duty to disclose, NWS cannot commit fraud. Not only did the District Court properly determine that NWS, a non-party to the MBCA and a completely separate entity from SMM, did not owe a duty to ATEL, it also correctly held that NWS did not have a duty to disclose the difference in the charter hire rate to ATEL.

> **2. THE COURT CORRECTLY CONCLUDED THAT NWS LACKED THE REQUISITE INTENT TO COMMIT FRAUD AND/OR INTENTIONAL MISREPRESENTATION**

---

[156] Compeaux T. Tr., ROA.12230.
[157] Compeaux T. Tr., ROA.12243-12244.
[158] Compeaux T. Tr., ROA.12243-12244.
[159] Compeaux T. Tr., ROA.12243-12244.
[160] Compeaux T. Tr., ROA.12243-12244.
[161] Compeaux T. Tr., ROA.12247.
[162] Compeaux T. Tr., ROA.12246-12247.

Despite the District Court's correct factual finding that NWS lacked the intent to commit fraud and/or intentional misrepresentation as it relied on the advice of its counsel, Atel again contends that NWS committed fraud when NWS did not inform ATEL that it was earning a fee for the services.  A good faith reliance on advice of counsel is evidence of lack of intent to defraud.[163]  This Court has explained the advice of counsel defense as follows:

> Advice of counsel, when given on full disclosure of all the facts and followed in good faith, may be a matter to be considered by the jury in determining the [defendant]'s guilt. For such a defense to be permitted, however, there must be at least some evidence that the attorney advised the defendant as his counsel.[164]

The evidence at trial established that the proposed amendment was not agreed to by the parties.  The contractual language applicable between SMM and Atel is set forth in the MBCA.  While the proposed amendment did not change the contractual terms of the MBCA, it is relevant with respect to a number of issues.

Atel is correct that DeWitt was instructed to either negotiate an amendment to the MBCA that would expressly authorize NWS to subcharter the Atel vessels at

---

[163] *See United States v. Carr,* 740 F.2d 339, 346 n. 11 (5th Cir.1984) ("Strictly speaking, good faith reliance on advice of counsel is not really a defense to an allegation of fraud but is the basis for a jury instruction on whether or not the defendant possessed the requisite specific intent." ); *United States v. Peterson,* 101 F.3d 375, 381 (5th Cir.1996) (holding "[a] good faith reliance on the advice of counsel is not a defense to securities fraud," but noting that it "represents possible evidence of an absence of any intent to defraud.").

[164] *United States v. Impastato,* 2007 WL 2463310 (E.D. La. Aug. 28, 2007) citing *U.S. v. Carr,* 740 F.2d 339, 347 (5th Cir.1984) (citations and quotations omitted).

a higher rate than that being paid to Atel, or terminate the MBCA.[165] However,
DeWitt was later advised by legal counsel, James Lank, that NWS could legally
subcharter at a rate set in NWS' sole discretion without the need for an amendment
to the MBCA.[166]    The District Court agreed with Lank's conclusion.[167]    The
District Court's ruling on this issue is supported by the relevant facts.

Lank drafted a proposed amendment **prior** to Lank's decision that NWS
could subcharter the Atel vessels at a charter hire rate higher than what was paid by
NWS to SMM.[168]    The proposed amendment stated that SMM's obligation to
obtain time charters would be fulfilled by entering into a MTCA with NWS,
"which may further subcharter the Vessels to other customers at rates set in its sole
discretion."[169]  Lank provided the proposed amendment that he drafted to DeWitt
who sent it to Plaisance who then provided the amendment to Atel.[170]

What Atel fails to point out and what the District Court heard, is that Vasco
Morais, in-house counsel for Atel, reviewed the proposed amendment and made
comments to the amendment.[171]    Although Morais clearly expressed his objection
to **other** proposed provisions in the proposed amendment by writing "no" on these

---

[165] ROA.1634.  Lank T. Tr., ROA.12391,12393-12394, 12424. *See also* Exhibit P-12, December 14, 2004 Memo from SMM Board of Directors, Appellants Record Excerpt 10.
[166] Lank T. Tr., ROA.12426-12430,  12467-12468.
[167] ROA.11089.
[168] Lank T. Tr., ROA.12393, 12396.
[169] Exhibit D-6, MBCA Proposed Amendment..
[170] DeWitt T. Tr., ROA.11825.
[171] Morais T. Tr., ROA.12178.  Exhibit D-6, MBCA Proposed Amendment.

provisions, Morais **did not** do so to the proposed provision regarding NWS' ability to charter the vessels at a rate set in its sole discretion.[172]  In his comments, Morais indicated that Atel did not have an objection to NWS subchartering the Atel vessels; rather he was concerned with the third party entities creditworthiness issues.[173]

Morais testified that on reviewing the proposed amendment language, he was specifically concerned that NWS could, under its language, earn higher rates; he also claimed that he immediately thought that NWS might not "disgorge" the money it earned form subchartering the Atel vessels.[174]  However, Morais admitted that SMM ultimately received his comments to the proposed amendment which comments did not disclose either of these "concerns".[175]

NWS was never aware that Atel believed that NWS had to disclose the higher charter hire rate it received and disgorge the money as Lank believed that Morais' comments to the amendment were Atel's position; those comments did not provide any objection to the language providing that NWS could subcharter the Atel vessels "at rates to be set in its sole discretion."[176]

When attempting to support its arguments by referring to Lank's advice, Atel conveniently fails to note Lank's testimony that when discussions regarding

---

[172] Morais T. Tr., ROA.12178.
[173] Lank T. Tr., ROA.12396-12397, 12453.  *See also* Exhibit D-6, MBCA Proposed Amendment.
[174] Morais T. Tr., ROA.12185.
[175] Morais T. Tr., ROA.12190.
[176] Exhibit D-6, MBCA Proposed Amendment.

the proposed amendment stalled out, DeWitt re-visited with Lank to review the MBCA to determine whether the amendment was needed.[177] Lank then reviewed the MBCA and reiterated that MBCA allowed NWS to subcharter the Atel vessels at rates set by NWS without an amendment to the MBCA.[178] When presented with this evidence at trial, the Court correctly determined that NWS relied on the good faith belief of its counsel, James Lank, that it was able to subcharter the Atel vessels and retain its fee for doing so.[179] Therefore, the District Court determined as a factual matter that NWS lacked the requisite intent to commit fraud.

The uncontroverted evidence presented at trial was that NWS lacked the requisite intent to commit fraud and/or intentional misrepresentation as it relied on advice of counsel and reasonably believed that Atel did not object to NWS subchartering the vessels at a rate set in its sole discretion. Therefore, the District Court's decision was not clearly erroneous and its decision should be affirmed.

### B.   THE DISTRICT COURT PROPERLY DETERMINED THAT NWS WAS NOT LIABLE TO ATEL FOR CONVERSION

The District Court also correctly ruled that NWS was not liable for conversion. In doing so, the Trial Court noted both that NWS and SMM were not

---

[177] Lank T. Tr., ROA.12398-12399.
[178] Lank T. Tr., ROA.12398-12399.
[179] ROA.11087-11090.

single business enterprises, that the MBCA did not prohibit subchartering, (as even Atel acknowledged) and that only SMM and Atel were parties to the MBCA.[180]

Based on these factual findings, the Court held that only SMM was required to pay all funds that it received with respect to the Atel vessels to Atel and that NWS was not under any such obligation.  Accordingly, Atel was not entitled to possession of the money NWS received as its fee in connection with its subchartering of the vessels[181].  As entitlement to possession is an element of the claim of conversion, and Atel had no such right with respect to the money received by NWS, the Court correctly held on the facts as it found them that there was no claim for conversion.

## II.    THE TRIAL COURT CORRECTLY DETERMINED THAT SMM HAS NO LIABILITY

### A.    THE DISTRICT COURT WAS CORRECT IN ITS FACTUAL FINDINGS WITH RESPECT TO THE MBCA AND ITS INTERPRETATION OF THE MBCA IN LIGHT OF THOSE FINDINGS

As discussed *supra*, the only parties to the MBCA were Atel and SMM. Atel has admitted that no contractual relationship existed between NWS and

---

[180] ROA.11060-11095.

[181] *Occidental of Umm al Qaywayn, Inc. v. A Certain Cargo of Petroleum Aboard the Tanker Dauntless Coloctronis,* 577 F.2d 1196, 1202 (5th Cir. 1978).

Atel.[182]   Therefore, any alleged breach of the MBCA could only have been

performed by SMM, not NWS.

### 1.    THE DISTRICT COURT CORRECTLY DETERMINED THAT SUBCHARTERING WAS ALLOWED UNDER THE MBCA

Atel again contends that the MBCA did not allow SMM and NWS to enter

into the MTCA, which allowed NWS to charter the Atel vessels at a rate chosen by

NWS.   Unfortunately for Atel, their logic is flawed and the District Court's

interpretation followed the language and intent of the MBCA, which allowed NWS

and SMM to enter into the MTCA and for SMM to subcharter the vessels to NWS.

Atel now argues that the "intent" of the contract shows that NWS was not allowed

to charter the Atel vessels.

Not only did Judge Africk (who previously presided over this matter until its

transfer to Judge Olivette-Brown) determine that NWS' subchartering of the Atel

vessels did not violate the MBCA,[183] the District Court also held that the MBCA

allowed the vessel to be subchartered.[184]   In fact, after hearing the evidence at trial

and reviewing the parties Post-Trial briefs, the District Court found that NWS was

allowed to time charter the Atel vessels because there was no prohibition on

subchartering in the MBCA (in fact the MBCA was silent on subchartering) and

---

[182] ROA.10587.
[183] ROA.3530-3537.
[184] ROA.11077.

NWS was on the list of pre-approved charterers of the Atel vessels[185] as it was expressly listed on Schedule II of the MBCA.[186]

Additionally, the District Court addressed Atel's argument that Schedule II was not intended to allow the entities on Schedule II to subcharter the vessels. Specifically, the District Court stated that any such intended prohibition as argued by Atel was "not articulated in the MBCA."[187]   The District Court also correctly determined that the MBCA allowed NWS to subcharter the vessels as "Morais, the attorney who negotiated the MBCA for ATEL, admitted that this was the first vessel management agreement he had negotiated and drafted" and that Atel could easily have included a provision in the MBCA to prevent subchartering but neglected to do so.[188]

Atel acknowledged that general maritime law allows parties to subcharter unless subchartering is prohibited by the terms of the original charter.[189]   In fact, Atel even admitted that the MBCA contemplated that SMM would subcharter the vessels. [190] What Atel now argues is that the MBCA allowed SMM and only SMM to subcharter the vessels, a provision that was not expressly stated anywhere in the MBCA.   In fact, Atel uses the term "End User" when it describes their alleged

---

[185] ROA.10590.
[186] ROA.11077.
[187] ROA.11077.
[188] ROA.11077.
[189] Benedict's on Admiralty § 186 (7th Ed. 2008) (citing *The Ely*, 110 Fed. 563, 570 (S.D. N.Y. 1901, affirmed 127 F. 447 (2d Cir. 1903), cert denied 189 U.S. 514 (1903)).
[190] *See* Appellant's brief.

intent that vessels were to be subchartered to another company. However, the words End User are not found anywhere in the MBCA. Interestingly, Schedule II of the MBCA presents a list of approved "Time Charterers."[191] SMM complied with the MBCA and Schedule II when it entered into the MTCA with NWS. Further, and contrary to Atel's argument regarding the intent of Schedule II of the MBCA, is that on the list of time charters is at least one company that is in the business of locating vessels for other companies, a vessel brokering company.[192] Although in hindsight Atel is now attempting to interpret language in the MBCA to prohibit the entities listed on Schedule II from subchartering the vessels, the District Court was correct that there is no such provision in the MBCA.

Atel's position that it was not its "intent" that the time charterers would be allowed to subcharter the Atel vessels is disproved by the testimony of Atel's in-house counsel, Vasco Morais, who negotiated the terms of the MBCA for Atel, and by the contract itself. Morais admitted that he did not know that, under the general maritime law, the absence of a provision prohibiting subcharters meant that subcharters were permitted.[193] Morais acknowledged he had given no thought to subcharters at the time Atel negotiated and entered the MBCA, either at the same

---

[191] Exhibit D-2, MBCA.
[192] Compeaux T. Tr., ROA.12236-12237.
[193] Morais T. Tr., ROA.12150-12153.

or higher charter hire rates than those received by Atel from SMM.[194]    Atel's

contention that if the MBCA is read as a whole, it was the intent of the parties that

subchartering not be allowed is flawed.   There were only two parties to the MBCA,

Atel and SMM.   SMM was aware that they would be marketing the vessels through

NWS  when  negotiating  the  MBCA  and  Atel  did  not  even  give  any  thought  to

subcharters when it was negotiating the MBCA.   The MBCAs are unambiguous;[195]

there is no provision in the MBCA that expressly prohibits subchartering.

Atel contends that the District Court ignored the law that each subsequent

charters  must  comply  with  and  cannot  deviate  from  the  terms  of  the  original

charter.[196]   However, the District Court properly applied the law and the MBCA to

the facts as it determined them when it held that SMM did not breach Article 3(b)

of the MBCA.

Article 3(b) of the MBCA provides that

> any  time  charter  shall  be  in  compliance  with  the  terms  and
> condition of this Charter and the form of such time charter shall
> be subject to the prior approval of ATEL, **except to the extent
> of a time charter with an entity identified on Schedule II**, in
> such case the time charter shall be provided to ATEL at the
> time of the collateral assignment thereof.[197]

---

[194] Morais T. Tr., ROA.12152.

[195] *See* Appellants' Brief.

[196] *See* Appellants' Brief.

[197] Exhibit D-2, MBCA; ROA.10579 (emphasis added).

The District Court correctly determined that the language of the MBCA clearly provides an **exception** for the provision that the time charter should be in compliance with the terms of the MBCA and subject to approval of ATEL. Clearly, when reading this provision of the MBCA, the time charter does not have to be in compliance with the terms of the MBCA and does not need to be approved by Atel if the entity is identified on Schedule II. Once again, testimony has established that some of the entities listed on Schedule II are in fact companies that broker vessels.[198]

SMM did not breach the MBCA when it entered into the MTCA with NWS, (which was acknowledged to be an entity listed on Schedule II by virtue of a name change), even if the MTCA included terms that were inconsistent with the terms of the MBCA. Interestingly, Atel claims that it would be illogical to read this contract language as the District Court has interpreted it. However, Atel's reading of this provision is illogical as it would be impossible for a time charter to contain all of the terms and conditions of the MBCA. For example, the MBCA is a demise charter and has a term of thirty-six months.[199] Atel could not possibly contemplate or intend that every charter that SMM entered with any third party oil and gas companies would be a demise charter with a term of thirty-six months.

---

[198] Compeaux T. Tr., ROA.12236-12237.
[199] Exhibit D-2, MBCA.

Additionally, Atel now argues that Article 6(b)(i) shows that the MBCA did not contemplate that SMM would charter the Vessels to a single entity. This is not a new argument by Atel. Again, the District Court, after hearing all of the evidence at trial, determined that SMM's practice of marketing the vessels by entering into a time charter agreement with NWS was permissible under the MBCA.[200] In fact, the District Court expressly stated that the "facts supported at trial do not support ATEL's conclusions" that SMM transferred its responsibility under Article 6(b)(i) to NWS.[201] Specifically, the District Court determined that "[t]he language of the MBCA and this evidence establishes that SMM was permitted to charter the vessels to NWS and have it market the vessels to the eventual End User, as this is how it [SMM] generally provided such services."[202]

Atel contends that the prohibition of subchartering the Atel vessels was further evidenced by the provision in the MBCA stating that "any and all time charters or other contractual relationships entered into with respect to the use of the Vessels shall be in the name of Sea Mar." However, this very provision allowed SMM to enter into the MTCA. In fact, the District Court specifically determined that "the evidence at trial indicates that all charter agreements SMM entered into

---

[200] ROA.11083.
[201] Exhibit D-2, MBCA (Article 6(b)(i) states "SEA MAR's commercially reasonable efforts to obtain time charters for the Vessels and to keep the Vessels under time charter throughout the terms of this Charter and for the solicitation, bidding, and negotiation of such time charters.").
[202] ROA.11083.

were in its name."[203]    This is one of the main provisions that made it clear that SMM was allowed to charter the vessels the way that they were chartered.  During the time the Atel vessels operated under the MTCA, a short-form time charter was entered between SMM and NWS every time NWS would subcharter the Atel vessels.[204]    Again, had Atel desired to prevent subsequent subcharters, it could have done so.  Absent that prohibition, the MBCA allowed SMM to time-charter the vessels to NWS, and NWS to subsequently subcharter the vessels.

Atel also contends that the provisions stating "[SMM] was responsible for collecting all time charter hire and other revenue generated from the operation of the Vessels"; that "[a]ll accounts receivable arising from the time chartering of the Vessels shall be remitted to [SMM];" and that "[SMM] shall issue invoices to time charterers of the Vessels for time charter hire and other amounts payable for use of the Vessels" show that Atel did not intend for the MBCA to permit subchartering. However, the evidence at trial established, and the District Court found as a matter of fact, that SMM was able to comply with these provisions even when the vessels were subchartered.  Specifically, SMM sent invoices to NWS for every short form time charter agreement that it entered into with NWS.  The only entity with which SMM entered into time charters with respect to the Atel vessels after SMM

---

[203] ROA.11085.
[204] Plaisance T. Tr., ROA.11651-11652.

executed the MTCA with NWS was NWS.[205]  SMM issued invoices to NWS for

the chartering of the Atel vessels.[206]  SMM was aware that NWS was subchartering

the Atel vessels and NWS issued invoices for same, which was allowed under the

MBCA.[207]  Article 7 did not obligate SMM to collect all revenues generated from

any subcharters of the vessels; this would be a ludicrous position as SMM was not

even a party to any subcharters.  Further, SMM did, in fact, collect all revenues for

the time charters it entered into with respect to the Atel vessels.[208]  That charter

hire rate was agreed to by Atel, paid by NWS to SMM, and remitted per the

MBCA to Atel.[209]  The obligations of the MBCA could not apply to the permitted

subcharterers to which SMM was not a party.  For the foregoing reasons, the

District Court's decision that the MBCA allowed the Atel vessels to be

subchartered should be affirmed.

> ### 2. THE DISTRICT COURT CORRECTLY DETERMINED THAT SMM COMPLIED WITH THE TERMS OF THE MBCA WHEN IT CHARTERED THE ATEL VESSELS TO NWS THROUGH THE MTCA

As discussed *supra*, the MBCA allowed SMM to enter into a MTCA with

NWS to charter the vessels.  Further, Atel agreed that the MBCA contemplated

that the vessels would be subchartered.  Unfortunately for Atel, it was in over its

---

[205] ROA.10587.
[206] Powell T. Tr., ROA.12322, 12336-12337.  ROA.10587.
[207] Auyeung T. Tr., ROA.12279-12280.
[208] Auyeung T. Tr., ROA.12279-12280.  Powell T. Tr., ROA.12333, 12336-12337.
[209] Powell T. Tr., ROA.12343.

head as it was unfamiliar with well-established maritime law and did not perform proper due diligence before executing the MBCA.  Morais, Atel's counsel, negotiated the MBCA with included the provision holding SMM responsible for marketing the vessels and also included the provision that the vessels would be marketed "as are generally performed by [SMM]."  As discussed throughout this brief, the Atel vessels were marketed by SMM as other vessels were generally marketed by SMM.  Additionally, as discussed *supra*, Atel did not pay twice for the same marketing service.  SMM provided one service to Atel by entering into the MTCA with NWS.  NWS then provided a service, including taking on credit risk and assuring timely payment, that it was compensated for by the 10% fee, when it marketed the vessels to third party oil and gas companies.

SMM complied with the MBCA when it negotiated the MTCA with NWS.  As noted above, it is illogical to read the MBCA to provide that SMM must negotiate, solicit, bid all subcharters. Further, there was no provision in the MBCA that prohibited NWS from subchartering the vessels and NWS was not a party to the MBCA.  Neither SMM nor Atel were in privity of contract with the charters between NWS and the third party oil and gas companies.

Additionally, the District Court correctly determined that SMM complied with Article 3(j) of the MBCA when it determined that this provision allowed SMM to market the vessels as it generally marketed the other vessels that it

operated.  Even Atel's own attorney has acknowledged that every word in a contract should be given meaning.  If Atel did not want to allow SMM to market the Atel vessels as they generally marketed the vessels that it operated, Atel should have so provided in the MBCA.  The fact that Atel was not aware of well-established general maritime law and industry custom that allowed SMM to market the vessels by time-chartering the vessels, and the vessels being subchartered, which was the manner that SMM generally marketed vessels, does not give rise to a breach by SMM.

Atel also argued that SMM would not have known that SMM marketed the vessels by entering into a time charter agreement with NWS as SMM initially directly invoiced the third party oil and gas companies when the Atel vessels first went into service.[210]  The District Court properly determined that Atel's failed to properly investigate how SMM marketed the vessels.[211]  Further, there was no evidence presented at trial that if SMM would have properly performed its due diligence before entering into the MBCA that SMM would not have informed Atel how SMM marketed the vessels.  It was up to Atel to perform its due diligence before executing a contract for the management of the Atel vessels.

The District Court after hearing the testimony at trial, correctly determined that SMM marketed the Atel vessels in the same manner as other vessels operated

---

[210] *See* Appellants' Brief.
[211] ROA.11089-11090.

by SMM.  Contrary to Atel's contention, the method used by SMM to market both the Atel vessels and the other vessels SMM operated were exactly the same.[212] NWS marketed both the Atel and Nabors vessels.[213]  The only difference was the money that NWS received from subchartering.

### 3.    The District Court correctly determined that the SMM exercised Commercially Reasonable Efforts to Market the Atel Vessels

Atel again argues that SMM did not use any efforts to obtain time charters as NWS obtained all of the time charters and negotiated and set all of the rates. SMM's marketing efforts of entering into a time charter agreement with NWS was commercially reasonable.  Powell, SMM's Vice President of Finance, entered into a MTCA with NWS on January 19, 2005 that allowed NWS to charter the Atel vessels.[214] The MBCA specifically permitted SMM to charter the vessels to NWS without prior approval from Atel.[215]  NWS had greater expertise and a greater number of personnel dedicated to marketing the vessels with as little downtime as practical.[216]  NWS possessed the Master Service Agreements with the various oil and gas companies, which allowed NWS to quickly and efficiently locate charters.[217]   Further, individuals at SMM assisted in marketing the vessels.

---

[212] ROA.10584
[213] Plaisance T. Tr., ROA.1619.  Powell T. Tr., ROA.12330-12331.
[214] Powell T. Tr., ROA.12330-12331.  ROA.10585-10590.
[215] Morais T. Tr., ROA.12153.  Schedule II of MBCA.
[216] Powell T. Tr., ROA.12325-12326.
[217] Plaisance T. Tr., ROA.11542.  Lank T. Tr., ROA.12434.  ROA.10590.

Specifically, Plaisance provided input and advice to NWS personnel recommending certain companies to which to subcharter the Atel vessels.[218]  In addition to providing services more efficiently than did SMM, NWS sometimes had to absorb certain costs.  For example, if NWS subchartered an Atel vessel to Exxon and the charter agreement between Exxon and NWS did not allow NWS to charge Exxon for fuel costs, then NWS would pay SMM those fuel costs without getting reimbursed.[219]  The arrangement between SMM and NWS to obtain sub-charters for the Atel vessels was a commercially reasonable arrangement.

The "commercial reasonableness" of the SMM arrangement is further supported by the utilization history of the Atel vessels before, during, and after SMM.

Prior to SMM marketing the vessel thorough NWS, the vessels had been dry-docked and essentially unutilized after coming off-charter with Seacor.[220]  During the time SMM operated the Atel vessels, Atel earned approximately thirty million dollars from SMM chartering the Atel vessels.[221]  After the MBCA was assigned to HOS in August 2007 such that the operations and marketing of the Atel vessels was performed by Hosbeck.[222]  The vessels were stacked and not earning

---

[218] Powell T. Tr., ROA.12325-12326.
[219] DeWitt T. Tr., ROA.12071-12072.
[220] ROA.10591.
[221] ROA.10591.
[222] Monroe T. Tr., ROA.11736-11737.

any money from charters.[223]    Atel was not satisfied with the utilization of their vessels while at HOS so they moved the vessels to Gulfmark.[224]   The Atel vessels were then managed by GulfMark, but were not given "100% attention"; Atel terminated their agreement with GulfMark.[225]   Atel then entered into an agreement with Bee Mar for Bee Mar to operate and charter the vessels.[226]

Morais, Atel's counsel, admitted that he reviewed the MBCA and, as an attorney, he was aware that all provisions of the MBCA were to be given effect unless the result is ridiculous or absurd.[227]   The MBCA did not state that SMM must use commercially reasonable efforts to obtain a commercially reasonable charter hire rate.[228]   In fact, the MBCA stated in Article 14 that "ATEL acknowledges, recognizes, and agrees that (i) SEA MAR does not represent or warrant that the Vessels will be time chartered for any specific period *or at any specific day rate* during the term of this Charter. . ."[229]

As the Court has ruled, the MBCA is clear and unambiguous; if Atel wished to contract that SMM would obtain  any particular charter hire rates when it was time chartering the Atel vessels, Atel could have (1) added the appropriate language in Article 3(b), and (2) not included the above discussed language in

---

[223] ROA.10591.
[224] Monroe T. Tr., ROA.11739-11740 and 11766.  ROA.10591-10592.
[225] Monroe T. Tr., ROA.11766.  ROA.10592.
[226] Monroe T. Tr., ROA.11740.  ROA.10592.
[227] Morais T. Tr., ROA.12160.
[228] Exhibit D-2, MBCA.  Plaisance T. Tr., ROA.11660.
[229] Exhibit D-2, MBCA, Article 14 (emphasis added).

Article 14.  As the District Court noted most tellingly, "The Court cannot find that SMM breached the MBCA in this respect because ATEL had different expectations, which are found nowhere in the express language of the MBCA."

Atel was "happy" with the charter hire rates it was receiving for the vessels and approved the rates.[230]   Although not obligated to do so, SMM obtained commercially reasonable charter hire rates for chartering the Atel vessels to NWS.[231]  Monroe admitted that it was his responsibility to ensure that the rates that Atel received were commercially reasonable rates.[232]   Plaisance and Monroe discussed the rates that SMM and eventually Atel would receive from NWS.[233] Monroe approved all of the rates that Atel received for the chartering of the Atel vessels.[234]   In fact, Monroe testified that his research on the website, *workboat.com,* during the relevant times revealed that Atel received market rates for the vessels.[235]   In addition to Monroe and Plaisance opining that Atel/SMM received commercially reasonable rates,  Compeaux, an expert in the area of vessel marketing of offshore vessels in the Gulf of Mexico and the commercial vessel

---

[230] Plaisance T. Tr., ROA.11660.  Monroe T. Tr., ROA.11766.
[231] Compeaux T. Tr., ROA.12263.  Monroe T. Tr., ROA. 11761-11763.
[232] Monroe T. Tr., ROA. 11761
[233] Plaisance T. Tr., ROA.11596.
[234] Monroe T. Tr., ROA. 11761.
[235] Monroe T. Tr., ROA. 11761-11763.

marketing environment in the Gulf of Mexico[236], also opined that the day rates received by Atel/SMM were market rates.[237]

It is also significant that before Atel entered into the MBCA with SMM, the Atel vessels were dry-docked and needed repair.[238]  During the time that the SMM operated the Atel vessels, Atel was "happy" with the utilization of the Atel vessels.[239]  Atel earned approximately thirty million dollars from SMM chartering the Atel vessels.[240]  The District Court's factual determination that SMM did not breach this provision is supported by the evidence and should be affirmed.

### 4.     THE DISTRICT COURT CORRECTLY DETERMINED THAT NWS' MARKETING OF THE ATEL VESSELS WAS AN "OTHER SERVICE" PERMITTED UNDER ARTICLE 13 OF THE MBCA

The District Court also correctly determined that NWS' marketing of the Atel vessels was an "other service" permitted under Article 13 of the MBCA.[241]

Article 6(b) clearly states that "[t]he Management Fee shall cover SEA MAR's profit and compensate **it [SMM]** for the general and administrative expenses incurred by SEA MAR in providing the services . . ."[242](emphasis added). The Management Fee was to compensate **SMM** for **its** commercially reasonable

---

[236] Compeaux T. Tr., ROA.12230.
[237] Compeaux T. Tr., ROA. 12263.
[238] Monroe T. Tr., ROA. 11706.  Plaisance T. Tr., ROA.11555-11556.
[239] Plaisance T. Tr., ROA.11660.  Monroe T. Tr., 11503.
[240] ROA.10591.
[241] ROA.11086.
[242] Exhibit D-2. (emphasis added).

efforts to charter the vessels and keep the vessels utilized.[243]   Morais, the attorney for Atel that participated in drafting the MBCA, testified that the management fee paid by Atel to SMM was to compensate SMM for the services provided to Atel by SMM, which included marketing.[244]

The District Court correctly determined that Article 6(b) compensated SMM's reasonable and customary accounting, clerical, **marketing** and personnel services **as are generally performed by SMM.**[245]   The District Court expressly stated that the evidence established that: (1) Morais did nothing to investigate how SMM generally performed marketing; (2) SMM normally marketed the vessels through NWS by entering time-charters with NWS and having NWS subcharter them; and (3) marketing the vessels through such subchartering was normal practice within the industry.[246]   Additionally, the District Court stated that the MBCA "did not foreclose SMM from sub-contracting the marketing to NWS" as "this was how SMM generally performed such services."[247]   Lastly, the District Court properly determined that Article 13 of the MBCA allowed NWS to charge a fee for the marketing service.[248]

---

[243] Exhibit D-2. (emphasis added).
[244] Morais T. Tr., ROA.12208.
[245] Exhibit D-2. (emphasis added).
[246] ROA.11086.
[247] ROA.11086.
[248] ROA.11086.

The District Court's interpretation of this provision was not clearly erroneous as the MBCA allowed SMM to expense any marketing costs it incurred for chartering the Atel vessels.[249]    Article 13 of the MBCA allows SMM to expense services from SMM or its designees to Atel provided the services were charged at commercially reasonable rates and industry standard pricing.[250]    NWS was a designee of SMM.[251]

Atel is in error when it contends that this Article did not contemplate marketing services because it sets forth illustrations of the types of services it intended to cover, such as supply and repair of the boat.[252] When cross-examined on this point, Morais conceded that in a contract each provision of the contract is given its plain meaning.[253]    In his experience as an attorney, he agreed that Article 13 when describing the services to be expensed back to Atel included a parenthetical which stated "including without limitation"; Morais admitted that this language indicated the listing in the Article was illustrative and not exhaustive and that expenses may be with respect to other types of services than those listed.[254] Accordingly, the District Court correctly determined as a matter of fact that Article 13 permitted payment of expenses for marketing by NWS.

---

[249] Exhibit D-2, MBCA, Article 13.
[250] Exhibit D-2, MBCA, Article 13.
[251] Doerre T. Tr., ROA.12040.
[252] Morais T. Tr., ROA.12209.
[253] Morais T. Tr., ROA.12160.
[254] Morais T. Tr., ROA.12210.

The amount retained by NWS for its marketing of the Atel vessels was at a commercially reasonable rate and reflected industry standard pricing.  As Compeaux testified, a 10% fee for marketing vessels was in line with market rates for those services.  This evidence was uncontradicted.  Atel's argument that it should not have to pay twice for a service that was negotiated and included in the original MBCA is flawed as Atel did not pay twice for the marketing of the vessels.  Atel paid SMM the Management Fee.  It did not pay NWS the 10% marketing fee.  NWS received its marketing fee from the third party oil and gas companies, not Atel.

Atel's argument with respect to the District Court's determination that Atel suffered no damage as a result of SMM not disclosing NWS' fees, assuming SMM was even aware of same, is addressed more fully below.

For the reasons discussed above, the District Court's judgment with respect to these issues should be affirmed.

> **5.     ATEL FAILED TO PROVE THAT IT SUFFERED DAMAGES AS A RESULT OF SMM'S ALLEGED BREACHES OF THE MBCA**

Atel contends that it suffered damages as a result of SMM's alleged breaches of:  (1) failing to collaterally assign a security interest in the MTCA to Atel; (2) failing to maintain records sufficient to account for the amounts retained by NWS; and (3) failing to disclose and report the amounts retained by NWS for

its "marketing services." Specifically, Atel contends that if SMM had collaterally assigned the security interest in the MTCA or maintained records reflecting the amounts that NWS retained, or disclosed the amounts earned by NWS, Atel would have placed SMM in default and/or exercised its right of termination under Article 10 of the MBCA and contracted with another management company.

Atel failed to present any evidence at trial that it would have been able to contract with a company that would have been able to obtain the same high utilization rate that SMM achieved by marketing the vessels to NWS. Although Atel contends that it would have been able to contract with HOS or a like company, the only evidence of other companies' utilization of the Atel vessels was that Atel was unhappy with the utilization that they received following the management by SMM. Atel did not present any evidence from any management companies that they purportedly would have used after the hypothetical termination to show that those companies would have been able to keep the vessels utilized at the same rate that SMM did and also obtain charter hire rates higher than those paid to Atel.

The burden of proof on this issue was on Atel. Atel simply failed to produce any evidence that it could have entered an agreement with respect to its vessels that would have resulted in any more income to Atel than what it actually received.

Accordingly, the District Court's determination as a matter of fact that Atel suffered no damages was correct and was most certainly not manifestly erroneous.

**B.    THE DISTRICT COURT WAS CORRECT IN ITS RULING THAT SMM DID NOT MAKE ANY FALSE REPRESENTATION OR DECEPTIVE NON-DISCLOSURES TO THE DETRIMENT OF ATEL WITH RESPECT TO THE METHOD OF MARKETING ATEL'S VESSELS**

The District Court determined as a matter of fact that Atel presented no evidence of any false statement by SMM as to how it would perform the marketing function.  The Court held that Atel's failure to determine how SMM "generally performed its function under the MBCA, under the facts of this case, did not amount to fraud."[255]  The District Court's findings on these facts were not manifestly error; in fact, they were correct.

SMM and Atel spent several months negotiating the terms of the MBCA before finally executing the MBCA.[256]  Under the terms of article 6(b)(iv) the MBCA, SMM was obligated to provide marketing of the Atel vessels as "such services [were] generally performed by" SMM.  In the months of the negotiations, Atel neither determined how SMM marketed the other vessels that SMM managed nor discussed the issue of subchartering.[257]  It was Monroe's duty to perform due diligence on behalf of Atel with respect to its business dealings with SMM, a

---

[255] ROA.11089-11090.
[256] Plaisance T. Tr., ROA.11545, 11558-11559, 11647. Morais T. Tr., ROA.12156-12157.
[257] Plaisance T. Tr., ROA.11648. Monroe T. Tr., ROA.11752.

company that Atel never worked with prior to this deal.[258]  To that end, Monroe visited SMM one time in New Iberia, Louisiana where he spent a "few days" observing the operations.[259]  While at SMM, Monroe did not request to view any contracts that SMM had with any of its customers or inquire as to the method by which SMM marketed the vessels SMM operated.[260]  In fact, Monroe decided that SMM had a marketing function based on the fact that Plaisance seemed to be friendly with individuals that Monroe felt were decision makers.[261]  He did not receive any specific representations from Plaisance in that regard.[262]

Additionally, Morais as counsel for Atel negotiated the terms of the contract for three to four months and did not personally investigate the method by which SMM marketed the vessels it operated.[263]  Instead, although marketing was purportedly an important consideration for Morais when executing the MBCA, Morais relied on Monroe and Monroe's conversations with Plaisance when Morais agreed to the language in the MBCA that stated SMM could perform marketing services "as are generally performed by Sea Mar [SMM] with the other vessels owned or operated by Sea Mar [SMM].[264]

---

[258] Monroe T. Tr., ROA.11745.
[259] Monroe T. Tr., ROA.11751-11752.
[260] Monroe T. Tr., ROA.11752.
[261] Monroe T. Tr., ROA.11752.
[262] Monroe T. Tr., ROA.11715-11716.
[263] Morais T. Tr., ROA.12158.
[264] Morais T. Tr., ROA.12156-12157.

Before entering into the MBCA, SMM marketed the vessels that it managed, including Nabors vessels, by entering into a master charter agreement with NWS, which would then subcharter the vessels.[265]  This capacity was available to SMM when it entered the MBCA with Atel.  In fact, Schedule II of the MBCA specifically listed NWS (albeit then Pool Well Services) as an entity to which SMM could time charter the Atel vessels without prior approval of Atel.[266]  The method used by SMM to market the Atel vessels was the same method used to market the other vessels it operated.

NWS would subcharter both the other vessels it time-chartered and the Atel vessels at rates NWS would negotiate with its customers.  There was no language in the MBCA that prohibited NWS from subchartering the Atel vessels at a higher rate.[267]  SMM and NWS were separate and distinct legal entities.[268]  SMM was allowed to enter into the MTCA with NWS, which allowed NWS to subcharter the vessels.  SMM did not have a duty to disclose to Atel that NWS was subchartering the vessels to other oil and gas companies as the MBCA specifically stated that SMM would market the vessels in the same manner by which SMM marketed the other vessels.[269]  Atel's failure to determine the manner by which SMM marketed

---

[265] Plaisance T. Tr., ROA.11540.  Powell T. Tr., ROA.12325-12326.
[266] Exhibit D-2, MBCA (Schedule II).
[267] Lank T. Tr., ROA.12439.
[268] Discussed throughout Appellees' Brief.
[269] Exhibit D-2, MBCA (Article 6(b)).

those vessels does not amount to a duty by SMM to disclose the method. Atel did not establish any fraud on the part of SMM.

Quite simply put, both at the trial Court and in its brief, Atel sought and seeks to establish fraud based on its claimed misunderstanding of the meaning of Plaisance being "friendly" with certain individuals, its own lack of understanding of the applicable law (despite representation by counsel), and its failure to inquire or clarify the meaning of the language within the MBCA whereby SMM could perform marketing services "as are generally performed by [SMM] with the other vessels owned or operated by [SMM]." Essentially, Atel decided long afterwards that it did not like the deal it made so it seeks to change it by crying "fraud". The District Court was entirely correct in its factual determinations and its holding that SMM did not commit fraud and the District Court's decision should be affirmed.

## C. THE DISTRICT COURT'S JUDGMENT THAT SMM WAS NOT LIABLE FOR NEGLIGENT MISREPRESENTATION WAS CORRECT

Atel contends that SMM is liable for negligent misrepresentation as SMM should have known that NWS was chartering the vessels at a higher rate to the end users than what was paid to SMM.[270] Specifically, Atel contends SMM was negligent because (1) Plaisance allegedly received on-charter forms showing a higher rate being charged to the end user than what was reported to Atel; (2) after allegedly inquiring about the difference in rates, Plaisance began receiving on-

---

[270] *See* Appellants' Brief.

charter forms where the higher rate was blacked out; and (3) Plaisance objected to NWS chartering the vessels at a higher rate than what was paid to SMM when the matter was discussed at a board meeting but was told that it was going to be done anyway.[271]   Significantly, most of the evidence that purports to support these contentions is Plaisance's own testimony, which the District Court heard and concluded was biased.[272]

Additionally, assuming Plaisance was aware that there was a difference in day rates, the difference in rates was allowed by the law and the MBCA, as discussed *supra*.  Further, the question of whether Plaisance exercised reasonable care with respect to the information, if he had it, is best answered by the ruling of the District Court.  Here, the Court has properly held that NWS was allowed to subcharter and receive a fee for its service under both the general maritime law and under the MBCA.[273]  The District Court also found as matter of fact that this was a conclusion reached by Lank after reviewing the MBCA.[274]   If an attorney reviewing the MBCA and the District Court both agreed the activity was proper, how could Plaisance be unreasonable for not disclosing it, if he knew of it?  As a matter of fact, Plasiance could not have been negligent in that regard.  Therefore, the District Court's decision should be affirmed.

---

[271] *See* Appellants' Brief.
[272] ROA.11081.
[273] ROA.3534, 11087-11090.
[274] ROA.3534, 11087-11090.

# CONCLUSION

The District Court's decisions were proper and the Final Judgment should be affirmed.  Atel's request for the judgment to be rendered in favor of Atel in the amount of $2,873,508.00, plus pre- and post-judgment interest and attorney's fees should be denied.

This 30th day of January, 2014.

Respectfully submitted,

*/s/ Thomas J. Smith*
THOMAS J. SMITH(#17148)–Lead Counsel
AMANDA E. KURZ (*Pro Hac Vice*) (TX# 24065578)
Galloway, Johnson, Tompkins Burr & Smith
1301 McKinney, Suite 1400
Houston, Texas 77010
Telephone:   (713) 599-0700
Facsimile:   (713) 599-0777
E-mail:      tsmith@gjtbs.com
E-mail:      akurz@gjtbs.com
*Attorneys for Appellees, Sea Mar Management LLC and Nabors Well Services Co.*

## CERTIFICATE OF SERVICE

I do hereby certify that I have on the 31st day of January 2014, served a copy of the foregoing pleading on counsel for parties to this proceeding by electronic filing and by mailing the same by United States mail, properly addressed and first-class postage prepaid.

*/s/ Thomas J. Smith*
THOMAS J. SMITH(#17148)–Lead Counsel
AMANDA E. KURZ (*Pro Hac Vice*) (TX# 24065578)

*Attorneys for Appellees, Sea Mar Management LLC and Nabors Well Services Co.*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

> This brief contains 13,462 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

> This brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in Times New Roman - 14 point

*/s/ Thomas J. Smith*
THOMAS J. SMITH(#17148)–Lead Counsel
AMANDA E. KURZ (*Pro Hac Vice*) (TX# 24065578)

*Attorneys for Appellees, Sea Mar Management LLC and Nabors Well Services Co.*